SLOUGH, J.
*722 "Principles of due process require that the juvenile court not terminate a presumed father's parental rights without first finding, by clear and convincing evidence, that the father is unfit." ( In re G.S.R. (2008) 159 Cal.App.4th 1202, 1205, 72 Cal.Rptr.3d 398 ( G.S.R. ).) In this dependency appeal, D.H., Sr. (father), the presumed father of D.H., argues the juvenile court violated due process by terminating his parental rights without making an unfitness or detriment finding against him by clear and convincing evidence at any point in the proceedings.
Beginning with In re Gladys L. (2006) 141 Cal.App.4th 845, 46 Cal.Rptr.3d 434 ( Gladys L. ), appellate courts have held juvenile courts must make a parental unfitness or detriment finding by clear and convincing evidence before terminating the rights of noncustodial, nonoffending fathers. As we explain post , the court's termination of father's rights violated this important constitutional safeguard because at no point in this dependency was it either "alleged [ ]or proven that [he] was an unfit parent." ( Id . at p. 847, 46 Cal.Rptr.3d 434.) Here, D.H. was removed from, and failed to reunify with, his paternal grandparents, who had been caring for him under a probate guardianship. The entire case, from the petition, to removal, to termination of services, focused on the grandparents, not father.[1] Nevertheless, at the permanency planning *723 hearing, the court terminated father's parental rights. Gladys L. and its progeny require us to "reverse the order terminating [father's] parental rights and remand for reconsideration whether a proper basis for such termination exists." ( G.S.R. , supra , 159 Cal.App.4th at p. 1205, 72 Cal.Rptr.3d 398.)
Respondent Riverside Department of Social Services (DPSS) urges us to depart from Gladys L. and adopt in the dependency context the best interest of the child standard for terminating parental rights under Probate Code section 1516.5. (See In re Guardianship of Ann S. (2009) 45 Cal.4th 1110, 90 Cal.Rptr.3d 701, 202 P.3d 1089 [upholding best interest standard in Probate Code section 1516.5 as constitutional].) We decline to make this radical change. Probate Code section 1516.5 applies when a legal guardian seeks to have the child declared free from the custody and control of one or both parents and was designed to "mak[e] it easier for children in probate guardianships to be adopted by their guardians ." ( In re Guardianship of Ann S. , at p. 1118, 90 Cal.Rptr.3d 701, 202 P.3d 1089, italics added.) That provision does not apply in a case like this, where the only reason the court is considering terminating parental rights is because the state brought a successful dependency action against the guardians. Father's entitlement to the constitutional safeguards articulated in Gladys L. does not vanish simply because D.H. was under a legal guardianship at the outset of the dependency.
I
FACTUAL BACKGROUND
A. The Petition Against the Grandparents
D.H. was born in 2008. He is the son of J.S. (mother) and father, who never married.
*308 [2] P.F. (grandmother) and A.F. (grandfather) are D.H.'s paternal grandparents. According to the detention report, they became his legal guardians in February 2010 under a probate court order. The record contains no other information regarding the circumstances of the guardianship.
*724 In March 2014, DPSS received a referral alleging the grandparents were neglecting D.H. According to the referral, "drug activity takes place in the garage of the home," where father and his girlfriend reportedly resided. The referral also reported father had a history of drug-related arrests and domestic violence. When the social worker interviewed the grandparents, they said father had been living in their garage "off and on." The social worker asked the grandparents to drug test. Grandfather tested negative. Grandmother could not produce enough saliva to test, and ultimately admitted she had taken methamphetamine the night before. She said father's girlfriend had given it to her and it was the first time she had ever taken the drug. The social worker asked grandfather if he knew about grandmother's drug use and he replied, "I plead the fifth on that."
DPSS took D.H. into protective custody and filed a dependency petition alleging he fell under section 300, subdivision (b)[3] (failure to protect). The petition alleged grandmother abused methamphetamine in the home and was under the influence while caring for D.H. It also alleged the grandparents allowed father and his girlfriend to reside in the garage when they "knew or reasonably should have known that they both abuse controlled substances and engage in domestic violence disputes." Although the detention report and petition referenced father, the petition contained no allegations against him.[4] All of the petition's allegations concerned the grandparents' ability to care for D.H.
At the detention hearing, the court found DPSS had made a prima facie showing D.H. fell within section 300, subdivision (b) based on grandmother's admitted methamphetamine use, as well as on the grandparents' failure to protect D.H. from father and his girlfriend's "possible" substance abuse. The court removed D.H. from the grandparents' custody and ordered alcohol and drug-related services for grandmother and parenting education services for grandfather. It ordered supervised *309 visits with the grandparents so long as grandmother took a drug test before each visit.
B. Removal from Grandparents' Custody
During a subsequent interview, grandmother reiterated her methamphetamine use was a "one time thing." She said she began caring for D.H. when *725 he was only a few months old and ultimately sought legal guardianship over him because mother did not want to take care of him. The grandparents had not seen mother in several years. When the social worker contacted mother (who is not a party to this appeal), she reported she was struggling with substance abuse and bipolar disorder and had not had any interaction with her son for two years.
D.H. told the social worker he felt safe in the home and enjoyed spending time with father. He said he slept in his own bedroom and father slept in the garage. When he wanted to play, he would knock on the garage door and father and his girlfriend would come into the grandparents' house and watch television with him or play with him. D.H. said everyone in the home got along well, except sometimes he could hear father and his girlfriend yelling at each other and sometimes the girlfriend hit father.
Grandmother said father was good with D.H. and she trusted him to care for his son. She said he would take D.H. on outings to "Chuck E. Cheese, Castle Park or the park." She said father no longer lived with them, however, and she did not know where he was.
By the filing of the jurisdiction/disposition report, father's whereabouts were unknown. Given the March 2014 referral, the social worker was concerned he might struggle with substance abuse and domestic violence. A search of his criminal history turned up a misdemeanor conviction for child cruelty in 1996 and two misdemeanor drug convictions in 2013.
Father appeared at the initial jurisdiction and disposition hearing in April 2014, but did not attend the continued hearing in May. The court found the allegations against the grandparents true by a preponderance of evidence. It also found it necessary under section 361, subdivision (c)(1) to remove D.H. from their custody. The court ordered DPSS to provide family reunification services to the grandparents and approved their case plan, which prohibited them from using drugs, allowing drug use in the home, and allowing father to reside in the garage.
C. The Grandparents' Unsuccessful Reunification Period
During the six-month review period, the social worker reported the grandparents were complying with their case plan and visits were going well. D.H. enjoyed spending time with them and "very much want[ed] to return to their home." Grandmother tested negative for drugs four times. At the review hearing in November 2014, the court expanded the grandparents' visits to include unsupervised overnights and weekends, and found a substantial probability D.H. could be returned to their care within six months.
*726 Unfortunately, things took a turn for the worse during the 12-month review period. In October 2014, the social worker learned through D.H. that the grandparents had been violating their case plan by allowing father to live in their garage and spend time with D.H., unsupervised. The social worker told the foster family to reduce the grandparents' visitation, but apparently the foster family did not do so.
Months later, in February 2015, D.H. told the social worker he saw father at the *310 grandparents' house every weekend. D.H. thought father was living there because he slept on a couch in the garage and stored his personal belongings there. D.H. said the grandparents had told him not to tell anyone father was sleeping in their garage.
Father's whereabouts were still unknown at this point. The social worker wrote in the 12-month review report that she had not had contact with him and was "unaware of his current living status, employment status, how he is supporting himself, his relationship status, or any other circumstances." The only information she had learned about father was he had been discharged from a substance abuse outpatient program in March 2015 for exceeding the limit of allowable absences and thus had a warrant for "failure to follow through with drug diversion."
The report recommended terminating the grandparents' services. The social worker cited their lack of judgment in allowing father unsupervised access to D.H. in violation of their case plan and the fact they "coach[ed D.H.] to lie to his caregiver and the Department about his father residing in their garage."
At the 12-month review hearing in June 2015, the court found the grandparents had failed to benefit from services and lacked insight. The court terminated the grandparents' services, found returning D.H. to their care would be detrimental to the child's welfare, and set a section 366.26 hearing to determine his permanent plan.
D. Termination of Father's Parental Rights
Father's whereabouts were still unknown when DPSS filed its 366.26 report in September 2015. The report recommended adoption and requested time to identify a prospective adoptive home. The report also recommended termination of parental rights, on the ground the bond between D.H. and his parents was "minimal."
In an addendum report, DPSS informed the court it had recently talked to father. He had given the social worker his current address in Riverside and reported he had not been living at the grandparents' house for at least a year.
*727 He was working in construction, specializing in bathroom and kitchen remodels. He said he had enrolled in a drug treatment program five months earlier, but was unable to complete it due to work and transportation difficulties. Likewise, he had not been in contact with DPSS because he had been overwhelmed, but he wanted to know what he needed to do to "get his child back." The social worker told him he could attend the upcoming November 2015 hearing and ask the court to appoint him an attorney.
Father attended the hearing and the court appointed him counsel. About two months later, the court found adoption was in D.H.'s best interest and terminated the grandparents' guardianship over the child.
DPSS placed D.H. in a prospective adoptive home in December 2015. In a January 2016 addendum report, DPSS informed the court it was concerned about the prospective adoptive parents' commitment level and unrealistic expectations for D.H. DPSS placed D.H. in a new prospective adoptive home in March 2016. In May, DPSS placed him in another prospective adoptive home, following two all-day and two overnight visits with the family. DPSS reported the family was "loving and open to [D.H.]" and D.H. wanted to be adopted by them.
That same month, father attended a hearing and asked the court for permission to visit D.H. The court replied he was allowed monthly visits under an existing order. DPSS added it wanted to hold off on visits with father for at least a month to *311 allow D.H. time to settle into his placement.
In a July 2016 addendum report, DPSS informed the court that D.H. had "adjusted positively" in his prospective adoptive home and that it was continuing to recommend termination of parental rights. Although D.H. had only been living with the prospective adoptive family for a few months, he appeared happy in the home. The prospective adoptive parents had three children of their own who were excited about the adoption.
On July 25, 2016, father called DPSS and provided his current address in Jurupa Valley. Father then attended the section 366.26 hearing in August 2016 and objected to DPSS's recommendation to terminate his parental rights. He asked the court to establish a legal guardianship over D.H. instead of proceeding with adoption and argued he shared the type of bond with D.H. described in section 366.26, subdivision (c)(1)(B)(i), commonly referred to as the "parental benefit exception" to terminating parental rights. DPSS argued for adoption and termination of parental rights, arguing father's visitation had been "inconsistent throughout the dependency."
The court terminated father's parental rights, stating: "A sufficient basis for termination of parental rights exist[s] based upon findings made at the *728 jurisdiction [and] dispositional hearing. At that hearing the mother and father were not offered services as they are not entitled pursuant to [Welfare and Institutions] Code 361.5(a). Termination of parental rights would not be detrimental to the minor in that none of the exceptions set out in Welfare and Institutions Code 366.21(c)(1), (a) and/or (b) apply in this case." In relevant part, section 361.5, subdivision (a) requires a court to provide reunification services to presumed fathers except "upon the establishment of an order of guardianship pursuant to Section 360."
Section 360 guardianships occur when a parent informs the juvenile court he or she is not interested in services after the child has been declared a dependent. (§ 360, subd. (a).) "The proceeding for the appointment of a [section 360] guardian shall be in the juvenile court." (Ibid. ) Although the record is bereft of information regarding the grandparents' appointment as guardians, D.H.'s could not have been a section 360 guardianship because the grandparents were appointed guardians in probate court long before D.H. became a dependent. The juvenile court seems to have been under the mistaken impression D.H.'s guardianship was established under section 360.
Father timely appealed the termination of his parental rights.
II
DISCUSSION
A. Father Did Not Forfeit His Argument
Before turning to the merits, we address DPSS's contention father forfeited his due process argument by failing to raise it with the juvenile court. A party forfeits a claim of error on appeal when he or she fails to raise the objection in the trial court; however, "application of the forfeiture rule is not automatic." ( In re T.G. (2013) 215 Cal.App.4th 1, 14, 155 Cal.Rptr.3d 1.) When a party raises an important constitutional argument like the one father raises here regarding his due process interest in the care and custody of his son, we exercise our discretion to consider the argument on its merits. ( Id . at pp. 13-14, 155 Cal.Rptr.3d 1 [refusing to apply forfeiture doctrine to the father's claim his due process rights were violated when the court terminated his parental *312 rights without a finding of unfitness or detriment]; accord, Gladys L. , supra , 141 Cal.App.4th at p. 849, 46 Cal.Rptr.3d 434, Frank R. (2011) 192 Cal.App.4th 532, 539, 121 Cal.Rptr.3d 348 ( Frank R. ).) We therefore decline DPSS's invitation to dismiss the appeal on forfeiture grounds. "Because father has raised a question of law, we review the claimed constitutional violation de novo." ( In re T.G. , at p. 14, 155 Cal.Rptr.3d 1.) *729 B. Due Process Requires a Detriment Finding
Gladys L. , the foundational California case on presumed fathers' constitutional protections against termination of their parental rights, explains: "Parents have a fundamental interest in the care, companionship, and custody of their children. ( Santosky v. Kramer (1982) 455 U.S. 745, 758, 102 S.Ct. 1388, 71 L.Ed.2d 599 ( Santosky ).) Santosky establishes minimal due process requirements in the context of state dependency proceedings. 'Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence .' [Citation.] ... '[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.' " ( Gladys L. , supra , 141 Cal.App.4th at p. 848, 46 Cal.Rptr.3d 434, italics added.)
Gladys, the minor in the appeal, had become a dependent of the juvenile court while in her mother's custody. ( Gladys L ., supra , 141 Cal.App.4th at p. 847, 46 Cal.Rptr.3d 434.) At the detention hearing, the department said it might amend the section 300 petition to assert allegations against the presumed father, but it never did so. ( Gladys L. , at p. 847, 46 Cal.Rptr.3d 434.) Like here, Gladys's presumed father "disappeared" after the detention hearing, and was not involved in the proceedings for the next three years. ( Ibid. ) He reappeared at the section 366.26 hearing and requested visits with Gladys. The juvenile court found it was not in the child's best interest to have contact with him and terminated his parental rights. ( Gladys. L ., at p. 847, 46 Cal.Rptr.3d 434.)
The Gladys L. court reversed the termination order, observing the case had not progressed like the typical dependency where, by the time of termination, the juvenile court had already "made prior findings that the parent was unfit." ( Gladys L. , supra , 141 Cal.App.4th at pp. 848-849, 46 Cal.Rptr.3d 434, quoting Cynthia D. v. Superior Court (1993) 5 Cal.4th 242, 254, 19 Cal.Rptr.2d 698, 851 P.2d 1307 ( Cynthia D. ), italics added.) Such prior findings, the court explained, " 'are necessary preconditions to termination [and] convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.' " ( Gladys L. , at p. 848, 46 Cal.Rptr.3d 434, italics added.) Indeed, the California Supreme Court described these prior findings of parental unfitness as "[t]he linchpin to the constitutionality of the section 366.26 hearing" because they "ensure 'the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself .' " ( Ibid. , quoting Cynthia D. , at p. 256, 19 Cal.Rptr.2d 698, 851 P.2d 1307, some italics added.)
Gladys's dependency was not like the typical dependency in that regard because "DCFS never alleged that [the father] was unfit and the trial court *730 never made that finding." ( *313 Gladys L. , supra , 141 Cal.App.4th at p. 848, 46 Cal.Rptr.3d 434.) The Gladys L. court concluded the juvenile court had "ignored" the "requirements of Santosky and the safeguards embedded in the California dependency scheme" by terminating the father's rights without having found he was unfit based on clear and convincing evidence at some point in the dependency . ( Id . at pp. 848-849, 46 Cal.Rptr.3d 434.)
Thus far no appellate decision has disagreed with the holding in Gladys L. and many have followed it. (See, e.g., In re T.G. , supra , 215 Cal.App.4th at pp. 23-24, 155 Cal.Rptr.3d 1 ; G.S.R. , supra , 159 Cal.App.4th 1202, 1211, 72 Cal.Rptr.3d 398 ; Frank. R. , supra , 192 Cal.App.4th at p. 537, 121 Cal.Rptr.3d 348 ; In re Z.K. (2011) 201 Cal.App.4th 51, 64-65, 133 Cal.Rptr.3d 597 ( Z.K. ).) For example, in Frank R. , the appellate court reversed an order terminating a nonoffending, noncustodial presumed father's parental rights on the ground the juvenile court had never made a finding of unfitness or detriment against him. ( Frank R. , at p. 534, 121 Cal.Rptr.3d 348.) The department had named the father in some of the petition's allegations, but the juvenile court ultimately dismissed those allegations. ( Id . at p. 535, 121 Cal.Rptr.3d 348.) Much like in our case, the father's contact with his children over the ensuing two years was "irregular and infrequent," and there were "long periods of time without contact at all." ( Id. at pp. 535-536, 121 Cal.Rptr.3d 348.) The father lived in a motel for the whole dependency, and as a result, had declined services and never requested custody. ( Id. at p. 536, 121 Cal.Rptr.3d 348.) Despite the father's absence from his children's lives and failure to request custody during the dependency, the Frank R. court held "the juvenile court failed to meet the Santosky requirements and overlooked the safeguards established by the California dependency scheme because the court never made a finding [he] was unfit, having never made a finding of detriment by clear and convincing evidence with respect to [him]." ( Id. at p. 538, 121 Cal.Rptr.3d 348.) The court remanded the case to the juvenile court "to determine whether, based upon the facts as they exist, a finding of unfitness may be made by clear and convincing evidence." ( Id. at p. 540, 121 Cal.Rptr.3d 348.)
" Gladys L. , Frank R. , and [their progeny] teach that a court may not terminate a nonoffending, noncustodial mother's or presumed father's parental rights without finding, by clear and convincing evidence, that awarding custody to the parent would be detrimental." ( In re T.G. , supra , 215 Cal.App.4th at p. 20, 155 Cal.Rptr.3d 1.) The finding need not occur at the section 366.26 hearing; "due process is satisfied if unfitness is established at an earlier stage, and parental rights terminated later based on the child's best interest." ( In re Guardianship of Ann S. , supra , 45 Cal.4th at p. 1134, 90 Cal.Rptr.3d 701, 202 P.3d 1089, citing Cynthia D. , supra , 5 Cal.4th at p. 256, 19 Cal.Rptr.2d 698, 851 P.2d 1307 and Santosky , supra , 455 U.S. at p. 760, 102 S.Ct. 1388.)
Thus, at minimum, a juvenile court must make a detriment finding against a presumed father before terminating his rights. The finding may be made at *731 the dispositional stage or during a subsequent review period, but it must occur prior to termination. " 'California's dependency scheme no longer uses the term 'parental unfitness,' but instead requires the juvenile court make a finding that awarding custody of a dependent child to [the] parent would be detrimental to the child.' " ( Frank. R. , supra , 192 Cal.App.4th at p. 537, 121 Cal.Rptr.3d 348, italics added.) This finding must be based on clear and convincing evidence. ( Id. at p. 538, 121 Cal.Rptr.3d 348 ) *314 No such finding occurred in this case. At no stage in D.H.'s dependency did DPSS allege, or the juvenile court find, that father was an unfit parent or that awarding him custody of D.H. would be detrimental to the child. All of the allegations in the petition, as well as the court's jurisdictional and dispositional findings, concerned the grandparents. While it included information about father in its reports, DPSS was never held to the standard of presenting clear and convincing evidence of father's ability to parent D.H. As a result, father has been deprived of the "minimal due process requirement" articulated in Santosky and applied in Gladys L. -the state must have at least clear and convincing evidence of parental unfitness before it may "sever completely and irrevocably the rights of parents in their natural child." ( Santosky , supra , 455 U.S. at pp. 747-748, 102 S.Ct. 1388.)
The juvenile court terminated father's parental rights based on its belief it had denied him services under section 361.5, subdivision (a) due to the existence of a section 360 guardianship and its finding termination would not be detrimental to D.H. In fact, the court never denied father services because it never considered whether to grant him services in the first place. If it had, section 361.5, subdivision (a) would not have supplied authority to deny services because D.H.'s guardianship was not under a section 360 guardianship. Thus, the sole basis for the court's decision to terminate father's parental rights was a best interest of the child analysis, which Gladys L. and its progeny make clear is insufficient. ( Gladys L. , supra , 141 Cal.App.4th at p. 847, 46 Cal.Rptr.3d 434 ; accord, Frank R. , supra , 192 Cal.App.4th at p. 538, 121 Cal.Rptr.3d 348 ; Z.K. , supra , 201 Cal.App.4th at p. 63, 133 Cal.Rptr.3d 597 ; G.S.R. , supra , 159 Cal.App.4th at p. 1205, 72 Cal.Rptr.3d 398.) Because the court made no findings against father, let alone findings based on clear and convincing evidence, due process requires we reverse the termination order.
DPSS argues section 366.26 does not require a finding of unfitness or detriment before a court may terminate parental rights. The court rejected this same argument in Z.K. , a more recent case applying the Gladys L. holding to a mother's constitutional interest in the care and custody of her child. The Z.K. court concluded the contents of section 366.26, a statutory provision, were "hardly determinative of whether mother's constitutional rights were violated by the termination of her parental rights." ( Z.K. , supra , 201 Cal.App.4th at p. 66, 133 Cal.Rptr.3d 597.) We agree. Gladys L. makes clear the source of the *732 detriment finding requirement is the Constitution, not the Welfare and Institutions Code. ( Gladys L. , supra , 141 Cal.App.4th at pp. 847-849, 46 Cal.Rptr.3d 434.)
Next, DPSS argues Gladys L.'s analysis is "potentially faulty" because the court relied on Santosky and Cynthia D. , which address termination of the rights of presumed parents from whom the minors had been removed , not of parents who had never had custody, like father here. Courts have rejected this argument as well. For example, in Z.K. , the court explained: "[F]rom a constitutional perspective, it was exactly because [the nonoffending, noncustodial parent] was not involved in the earlier stages of the proceeding that a specific finding of detriment was needed before her rights were terminated at the section 366.26 hearing ... [T]he only reason the termination of parental rights at a section 366.26 hearing in a typical dependency proceeding is constitutional is because of the findings that have necessarily been made as to the parent at earlier stages of the proceeding. Here, no such findings were made as to mother because her *315 whereabouts were unknown and she was not a subject of the earlier stages ... [M]other 'was not the custodial parent, the child was not removed from her custody and she was not denied placement [at the dispositional hearing].' Thus, to terminate her parental rights at the section 366.26 hearing over her request for custody, a specific finding of detriment, supported by clear and convincing evidence, had to be made." ( Z.K. , supra , 201 Cal.App.4th at p. 66, 133 Cal.Rptr.3d 597, italics added.) Again, we agree with the reasoning in Z.K.
DPSS argues in the alternative, if an unfitness or detriment finding is required, we can infer one from the record. For obvious due process reasons, appellate courts refuse to make such an important finding in the first instance. Even in cases where there may have been "valid bases" for the juvenile court to have found a father unfit, appellate courts will not infer such a finding as it requires them " 'to act as petitioner and fact finder, thereby denying [the father] an opportunity for notice of specific charges and an opportunity to respond to the charges against him.' " ( Frank R. , supra , 192 Cal.App.4th at p. 539, 121 Cal.Rptr.3d 348, quoting Gladys L. , supra , 141 Cal.App.4th at p. 848, 46 Cal.Rptr.3d 434.)
We are aware of only one case where the appellate court inferred a detriment finding to support a termination order when the juvenile court had made no findings against the father during the dependency. In In re G.P. (2014) 227 Cal.App.4th 1180, 174 Cal.Rptr.3d 179 ( G.P. ), the father's counsel had argued at the permanency planning hearing that the juvenile court was not required to make a detriment finding before terminating parental rights. ( G.P. , at pp. 1194-1195, 174 Cal.Rptr.3d 179.) On appeal, the father argued the lack of any detriment finding violated due process. The appellate court concluded even if his counsel had not invited the error, it could infer a detriment finding based on the fact he never had a relationship with his *733 children, was currently serving a lengthy prison sentence in Indiana, and was likely to be deported upon his release. ( Id. at p. 1196, 174 Cal.Rptr.3d 179.)
Even if we were inclined to overlook the due process concerns expressed in cases like Gladys L. and Frank R. , we would nevertheless refuse to infer a detriment finding on this record. Here, father did not invite the failure to make a detriment finding. And, unlike the father in G.P. , father does have a relationship with D.H. and there is evidence the relationship is positive. D.H. reported he liked spending time with father, and grandmother said father was good with D.H. and would take him on various outings. Additionally, father is not incarcerated and therefore physically incapable of raising his son like the father in G.P. was. As of October 2015, father reported he was employed and had stable housing.
We are sympathetic to DPSS's concern that father has not shown much initiative or parental responsibility during the dependency proceedings thus far. Despite being aware of DPSS's involvement in his son's life, he failed to appear at several hearings, and failed to complete a drug treatment program unrelated to the dependency. This evidence does raise questions about his fitness as a parent. However, the statements about father in DPSS's reports do not constitute clear and convincing evidence he is unfit or it would be detrimental to D.H. to place the child in his custody.
"At a minimum," a presumed father is "entitle[d] to an opportunity to defend himself against a factually specific charge that he is not."
*316 ( G.S.R. , supra , 159 Cal.App.4th at p. 1214, 72 Cal.Rptr.3d 398.) "It is not up to [the father] to prove he is a fit parent. Rather, it is up to [the department] to satisfy its constitutional burden to establish, by clear and convincing evidence, that he is not." ( Id. at pp. 1214-1215, 72 Cal.Rptr.3d 398.) "[A]lthough there may be valid bases for the juvenile court to make a finding of father's unfitness, the [juvenile] court never made that finding, ... [and w]e may not make that finding here or infer such a finding." ( Frank R. , supra , 192 Cal.App.4th at p. 539, 121 Cal.Rptr.3d 348.) As far as we can tell, father's last drug conviction was a misdemeanor from 2013. Because factual findings are the province of the juvenile court, we refuse to draw any conclusions about father's parental fitness from this limited appellate record.
Finally, DPSS argues the California Supreme Court's 2009 companion probate decisions In re Guardianship of Ann S. and In re Charlotte D. (2009) 45 Cal.4th 1140, 90 Cal.Rptr.3d 724, 202 P.3d 1109 ( Charlotte D. ) indicate a detriment analysis was unnecessary and all that due process required was a best interest analysis. In those two cases, our high court addressed the constitutionality of Probate Code section 1516.5, which authorizes a probate court to terminate parental rights when a guardianship has continued for at least two years and the court finds adoption by the guardian would be in the child's *734 best interest. Probate Code section 1516.5"mak[es] it easier for children in probate guardianships to be adopted by their guardians" because, formerly, guardians had to show one of the exceptions in Family Code section 7822 et seq. applied if they wanted to adopt without the consent of the child's parents. ( In re Guardianship of Ann S. , supra , 45 Cal.4th at p. 1118, 90 Cal.Rptr.3d 701, 202 P.3d 1089.)
In both cases, the probate court had terminated parental rights under Probate Code section 1516.5 upon finding that adoption was in the child's best interest. The parents appealed, arguing the provision was unconstitutional for failing to require the court to make an unfitness or detriment finding before terminating parental rights. ( In re Guardianship of Ann S. , supra , 45 Cal.4th at p. 1127, 90 Cal.Rptr.3d 701, 202 P.3d 1089 ; Charlotte D. , supra , 45 Cal.4th at p. 1147, 90 Cal.Rptr.3d 724, 202 P.3d 1109.) The court concluded a best interest analysis was a sufficient precursor to terminating parental rights in the typical Probate Code section 1516.5 case. It based this conclusion on the fact Probate Code section 1516.5 applies to parents who have already relinquished their custodial responsibilities for two years while the child and guardian developed interests in a stable placement and the child's care and custody. ( In re Guardianship of Ann S. , at p. 1118, 90 Cal.Rptr.3d 701, 202 P.3d 1089.) The court emphasized its holding was "a narrow one, limited to [the] contention that due process demands a finding of parental unfitness at a [Probate Code] section 1516.5 hearing." ( Id . at p. 1135, 90 Cal.Rptr.3d 701, 202 P.3d 1089.)
Despite this caveat, DPSS asks us to extend that holding to the termination of parental rights in a dependency setting. We refuse to do so because the circumstances in dependencies are so different from probate adoption proceedings. As the court noted in In re Guardianship of Ann S. , Probate Code section 1516.5 was intended to facilitate the adoption process for guardians who have cared for a child for more than two years, in situations where the parents have "failed to exercise any custodial responsibility for [that] period." ( In re Guardianship of Ann S. , supra , 45 Cal.4th at p. 1118, 90 Cal.Rptr.3d 701, 202 P.3d 1089.) In such cases, "the child develops an interest in a stable, continuing placement, and the guardian acquires a *317 recognized interest in the care and custody of the child" precisely because the guardianship has proceeded successfully for a two-year period. ( Ibid. , italics added.)
By contrast, in this particular dependency, the guardianship did not proceed successfully but instead necessitated state intervention, followed by removal and foster care. Unlike a Probate Code section 1516.5 case, D.H. had not been in a successful guardianship for a two-year period when the court terminated father's parental rights. Instead, the child had been in a prospective adoptive home for three months. As a result, the particular interests that take precedence over parents' interests in Probate Code section 1516.5 cases-the child's interest in stability and the guardians' interest in care and custody-were not present to nearly the same degree. Here, the guardians'
*735 interests were irrelevant because they had been deemed unfit to care for D.H.; the prospective adoptive family's interests were nascent, as they had only recently started caring for D.H.; and D.H.'s interest in stability had been unfortunately stalled by the difficulty in finding him a prospective adoptive home.
In re Guardianship of Ann S. highlights additional "significant" distinctions between dependencies and probate adoption proceedings. ( In re Guardianship of Ann S. , supra , 45 Cal.4th at p. 1122, 90 Cal.Rptr.3d 701, 202 P.3d 1089 ["The differences between probate guardianships and dependency proceedings are significant"].) "A section 1516.5 proceeding is brought to permit a private adoption by the guardian. Dependency proceedings are fundamentally different." ( Id. at p. 1133, 90 Cal.Rptr.3d 701, 202 P.3d 1089.) In probate guardianships, "[u]nlike dependency cases, ... [i]t is the family members and the guardians who determine, with court approval, whether a guardianship is established, and thereafter whether parent and child will be reunited." ( Id. at p. 1122, 90 Cal.Rptr.3d 701, 202 P.3d 1089 ) "The state is not a party to a probate guardianship, and its resources are not pitted against the parent. [Citation.] Nor does the state assume jurisdiction over the child and proceed toward family reunification or an alternative permanent placement ... Rather, probate guardianship is a private custody arrangement, approved but not supervised by the court. The state initiates no proceedings and carries no burden to prove anything. It performs only a judicial role." ( Id. at p. 1133, 90 Cal.Rptr.3d 701, 202 P.3d 1089.) These significant differences lend further support to our decision not to extend the holding of In re Guardianship of Ann S. and Charlotte D. to this case.
DPSS points out that the authors of California Juvenile Courts Practice and Procedure have noted the rationale behind the best interest analysis in Probate Code section 1516.5 may apply to dependencies. Their treatise states: "An argument can be made that under Charlotte D. and Guardianship of Ann S. , a finding of unfitness is not constitutionally required in all cases involving a presumed ... parent before their rights can be terminated, where the child has developed a protected interest in remaining with the adoptive parents, and doing so is in their interest. In such cases the court should look to the nature of the relationship between the parent and the child, and whether the parent demonstrated a commitment to his or her parental responsibilities ... This is an area to watch for further developments." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2016 ed.) § 2.60 [7], p. 2-143.)
Whether or not we agree there may be factual scenarios where a best interest analysis would sufficiently protect a presumed father's constitutional rights in a dependency setting-an issue we need not *318 decide here-we hold this is not one of those scenarios. D.H. had lived with his prospective adoptive parents for only three months and the record contains scant information about the bond they shared. Additionally, because the dependency *736 proceeding was entirely focused on the grandparents' ability to care for D.H., the record also contains minimal information about father. These information gaps are significant. For example, we do not know if father struggles with substance abuse, nor can we say how much he participated in D.H.'s life during the guardianship or what were the circumstances surrounding the grandparents' guardianship petition. Faced with such unknowns, "any lack of information ... has to be held against the department, not against [the parent]." ( Z.K. , supra , 201 Cal.App.4th at p. 67, 133 Cal.Rptr.3d 597.)
We note DPSS's reports indicate there were probate proceedings in 2010 in which the probate court granted the grandparents' guardianship application. On remand, the juvenile court may review D.H.'s probate file to determine if it contains any findings relevant to father's parental fitness. If so, the juvenile court may consider them in its analysis, bearing in mind however, that its conclusion as to detriment must be based on father's current circumstances. ( Cynthia D. , supra , 5 Cal.4th at p. 256, 19 Cal.Rptr.2d 698, 851 P.2d 1307 [detriment finding must occur in the proceeding where parental rights are terminated and be based on current circumstances]; see also In re Rodrigo S. (1990) 225 Cal.App.3d 1179, 1186, 276 Cal.Rptr. 183 ["a finding of detriment to the [dependent] child must be based on present circumstances rather than on the family situation which existed at the time the child was initially removed from parental custody"].)
We reiterate the sentiments of the Second District in G.S.R. , when it reversed a termination order for the same reason we do here: "We recognize and regret the procedural and emotional difficulty of undoing this fundamental error at this stage of the process, ... Still, we cannot allow the process to continue on the path toward termination of parental rights without further review in the trial court. We cannot undo the process but we can pause and restart the proceedings." ( G.S.R. , supra , 159 Cal.App.4th at p. 1215, 72 Cal.Rptr.3d 398 [reversing the termination order based on "DCFS's failure to demonstrate sufficient detriment and the juvenile court's failure to find a legitimate basis for deeming him unfit"]; see also Gladys L. , supra , 141 Cal.App.4th at p. 849, 46 Cal.Rptr.3d 434 ["Although ... reversal ... undermines the important goal of rapidly concluding dependency proceedings, it is the only way to safeguard [appellant's] rights as [the] presumed father and ensure that he is afforded due process"].) In future cases where a parent is not named in the petition, DPSS can avoid this kind of delay by presenting evidence of detriment and requesting the court make a specific finding against the parent as soon as it anticipates recommending termination of that parent's rights.
*737 III
DISPOSITION
We reverse the order terminating father's parental rights and remand the case to the juvenile court to determine whether there is clear and convincing evidence to support a finding of parental unfitness or detriment, based upon the facts as they currently exist. If the court finds detriment, the order terminating parental rights shall be reinstated.
*319 I concur:
CODRINGTON, J.

A "nonoffending" parent is one who has not been the subject of a jurisdictional finding under Welfare and Institutions Code section 300. (E.g., In re A.A. (2012) 203 Cal.App.4th 597, 606, 136 Cal.Rptr.3d 912.) Father is nonoffending because the court did not sustain any jurisdictional allegations against him.

Although the appellate record does not contain a paternity finding, the parties agree father is the presumed father. The court referred to him as such at hearings, and the Welfare and Institutions Code section 366.26 reports state the court found him to be the presumed father on May 7, 2015. Additionally, he is listed as the father on D.H.'s birth certificate, which indicates mother and father signed a voluntary declaration of paternity. (See Fam. Code, § 7611 [a voluntary declaration of paternity executed after Jan. 1, 1997 allows the male signatory to have presumed father status in dependency proceedings]; Cal. Rules of Court, rule 5.635(c) ; Health & Saf. Code, § 102425, subd. (a)(4)(C) [unwed father's name shall not be listed on birth certificate unless parents "sign a voluntary declaration of paternity at the hospital before the birth certificate is submitted for registration"]; In re Raphael P. (2002) 97 Cal.App.4th 716, 738, 118 Cal.Rptr.2d 610.)

Unlabeled statutory citations refer to the Welfare and Institutions Code.

The detention report said DPSS had received five neglect referrals during the first year or so of D.H.'s life. Some of those referrals were against both mother and father and some solely against mother. DPSS ultimately determined two of those allegations were substantiated, both against mother-that she had tested positive for amphetamine upon giving birth to D.H. and for methamphetamine upon being admitted to San Bernardino Community Hospital for mental health issues about a year later. The record contains no prior substantiated referrals against father.