Filed 10/13/22 In re Cassidy S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re CASSIDY S., a Person Coming Under the Juvenile Court Law. | B315634 (Los Angeles County Super. Ct. No. 17CCJP01621C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ARTURO Y., Defendant and Appellant. | |

APPEAL from the order of the Superior Court of Los Angeles County, Hernan D. Vera, Judge. Affirmed.

Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

The juvenile court found that Arturo Y. (Arturo)[1] was a young girl's presumed father but not her biological father and terminated Arturo's parental rights in August 2021. On appeal from the termination of his parental rights, Arturo claims that the juvenile court's September 2019 order ending the reunification period and setting the matter for a permanency planning hearing was defective for several reasons. We conclude that Arturo's arguments lack merit, and affirm the termination of his parental rights.

## FACTS AND PROCEDURAL BACKGROUND

### I. Family

Lizbeth R. (mother) has three children—Jadyn Y. (born 2005), K'Lynn S. (born 2009), and Cassidy S. (born 2014). Each child has a different father. Arturo is Jadyn's father; Mark S. (Mark) is K'Lynn's father; and Cassidy's father is unknown.

Between 2013 and 2017 Jadyn and Cassidy lived in the home of mother's parents, the maternal grandparents. During

---

[1] Because there are multiple fathers involved in this case, we refer to the fathers by their first names. We mean no disrespect.

that period of time, Arturo was also renting a room in the maternal grandparents' house and taking care of Jadyn.

K'Lynn was living with her father, Mark.

Mother would occasionally stop by the maternal grandparents' home to shower, but she was using drugs and spending most of her time associating with other drug users, many of whom were homeless.

## II. Problems with Drugs and Domestic Violence

Back in 2017, mother had a significant drug problem.

In October 2017, mother and Mark got into a fight while driving. With Cassidy in the back seat, Mark pulled over the car and started "repeatedly" striking mother in the face. When mother started screaming, the police responded and Mark recklessly drove to evade the responding officers before eventually pulling over. Once he stopped, mother fled out the passenger side door. The police found marijuana and other prescription drugs in the car. This was not the first incident of domestic violence between mother and Mark: In the prior year, Mark had struck mother on two different occasions, as well as choked her, brandished a gun at her, and threatened to kill her; mother also struck Mark in 2016, and was convicted of misdemeanor domestic violence for doing so.

## III. Petition

On November 7, 2017, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over Jadyn, K'Lynn and Cassidy based on the following allegations: (1) mother and Mark "have a history of engaging in violent altercations in the children's presence," which places the children at risk of physical harm and thereby warrants the exercise of

3

dependency jurisdiction under Welfare and Institutions Code section 300, subdivisions (a) and (b)[2]; (2) mother is "a current abuser of amphetamines and marijuana, which renders [her] incapable of providing regular care for the children" and thereby warrants the exercise of dependency jurisdiction under section 300, subdivision (b); (3) mother's conduct of driving with Cassidy in a car with easily accessible drugs in October 2017 "placed . . . Cassidy in a detrimental and endangering situation," thereby warranting dependency jurisdiction over all three children under section 300, subdivisions (b) and (j); and (4) mother left Cassidy in maternal grandmother's care "without making an appropriate plan for [Cassidy's] ongoing care and supervision," thereby warranting dependency jurisdiction under section 300, subdivision (b).[3]

## IV. Arturo's Request To Be Declared Cassidy's Presumed Father

The day after the Department filed its petition, Arturo filed a petition asking to be declared Cassidy's "presumed father." Arturo is not Cassidy's biological father, but alleged that he should be declared her presumed father because he has provided for her "day to day care," because he has paid her expenses, and because he has been Cassidy's "primary caretaker" since she was seven months old.

---

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3]     The Department made additional allegations against Mark, but Mark is not a party to this appeal, so we do not discuss him further.

At the April 25, 2018 hearing, the juvenile court granted Arturo's application and declared him to be Cassidy's presumed father.

## V. Juvenile Court's Exertion of Dependency Jurisdiction and Dispositional Orders

On April 25, 2018, the juvenile court sustained most of the allegations in the petition pertaining to mother, and declared all three children to be "dependents." The court allowed Jadyn to remain in Arturo's custody, but ordered K'Lynn removed from both mother and Mark, ordered Cassidy removed from both mother and Arturo, and permitted Arturo to have unmonitored visitation with Cassidy. Although the court at some points said it was not making a "case plan" for Arturo, the court nevertheless ordered "reunification" for "the minor and parents," and went on to expressly and specifically "order" Arturo to (1) "do a parenting class" and (2) "engage in conjoint counseling with [Jadyn]."

## VI. Reunification Period

Between April 2018 and September 2019, the Department offered Arturo and mother reunification services. During that period, Arturo never enrolled in the parenting class and never attended any conjoint therapy sessions with Jadyn. Since moving out of the maternal grandparents' home in 2018, Arturo's housing had not been stable and his visitation with Cassidy had been "sporadic" as conflicts between him and the maternal grandmother deepened. As Cassidy became verbal, she reported that she enjoyed the time she spent with Arturo, but repeatedly called Mark—not Arturo—her "daddy."

The juvenile court conducted the six-month review hearing on October 24, 2018. Arturo's attorney was present. Due to

Arturo's lack of progress, the court ordered that the Department continue to provide services to him.

Setting the next review hearing proved to be more challenging. The juvenile court originally set a hearing for April 24, 2019. Arturo's attorney appeared, but the court continued the hearing to June 12, 2019. When neither Arturo nor his attorney appeared at the June 12, 2019 hearing, the court continued it to September 3, 2019. Because that date was nearer to 18 months than 12, the court considered it to be the 18-month review hearing. Neither Arturo nor his attorney appeared at the September 3, 2019 hearing. The juvenile court nevertheless proceeded with the hearing, terminated reunification services for "mother and father," and set a permanency planning hearing for Cassidy. At the conclusion of the hearing, the court orally informed mother and Mark that they would "need to file a special writ under the procedures described in the notice" if they "desire[d] to challenge on appeal the court's order terminating . . . reunification services." Because Arturo was not present, the court clerk served on Arturo by first-class mail "the Notice of Entry of the above minute order of September 3, 2019 and form(s)."

Arturo did not seek a writ challenging the termination of reunification services.

## VII. Permanency Planning

After the juvenile court terminated reunification services, Cassidy remained in the maternal grandparents' custody. In their care, Cassidy was "thriving" and "doing well"; she reported feeling "safe" with them. Arturo's visits with Cassidy continued to be "sporadic" and his visits stopped altogether in February 2021. The reasons for Arturo's lack of regular visitation were in

6

dispute: Arturo blamed it on maternal grandmother not liking him, and maternal grandmother indicated that Arturo was not sticking to the agreed-upon visitation schedule. Arturo did not enroll in conjoint counseling and the record does not reflect that Arturo ever completed or enrolled in the ordered parenting class. Cassidy at one point indicated that she wanted to "live with her father" (who she viewed as Mark, and not Arturo), but later expressed that she wanted to make her maternal grandparents' home "her permanent home."

After the maternal grandparents expressed a desire and intent to adopt Cassidy, the Department explicitly recommended that the permanent plan for Cassidy be adoption by the maternal grandparents; the Department made that recommendation in its March 3, 2021 report, in its addendum to that report, and in its July 15, 2021 report. The July 15, 2021 report was served on Arturo.

Setting the permanency planning hearing also proved to be challenging. The hearing was originally set for January 14, 2020. However, as the hearing on January 14 began, the court saw that Arturo was not given proper notice, so the court ordered that proper notice be given and continued the hearing to March 3, 2020. On March 3, 2020, counsel for all the parties appeared and the court granted the Department's request for a 60-day continuance. Then the pandemic hit. At the next scheduled hearing on March 15, 2021, neither Arturo nor his attorney were present, so the juvenile court continued the hearing to May 3, 2021. On May 3, 2021, both Arturo and his attorney were present, but the court continued the hearing to August 3, 2021, and ordered the Department to prepare a report addressing Cassidy's wishes regarding placement, and Arturo's visits with

7

Cassidy and his involvement in her life. On August 3, 2021, Arturo's attorney was present; the court found notice to be proper for all parties, but continued the hearing to August 31, 2021.

On August 31, 2021, both Arturo and his attorney were present. Arturo nevertheless objected to the notice because it listed his wrong address, it was untimely, and it did not lay out that the Department sought to terminate his parental rights. The trial court overruled Arturo's objections to the adequacy of the notice, pointing out that the prior reports indicated the Department's recommendation for "adoption," which necessarily contemplates the termination of parental rights. Arturo objected to adoption, favoring legal guardianship instead. But the juvenile court overruled that objection, finding that Cassidy was adoptable and that there were no pertinent exceptions. The court then terminated mother's and Arturo's parental rights over Cassidy.

## VIII. Appeal

Arturo filed this timely appeal.

## DISCUSSION

In this appeal, Arturo does not challenge the juvenile court's order terminating his parental rights due to anything that happened at the permanency planning hearing on August 31, 2021. Instead, he argues the termination of parental rights should be overturned because of defects with the September 2019 hearing terminating reunification services and setting the matter for a permanency planning hearing. As to defects at the September 2019 hearing, Arturo points to (1) the Department's failure to interview him for the report immediately before that hearing, (2) the defective notice he got for that hearing, which is why neither he nor his attorney appeared, (3) the juvenile court's

8

failure to mention Arturo's status as a presumptive father during the hearing, and (4) the lack of evidence to support the court's setting the matter for a permanency planning hearing rather than putting Cassidy back in Arturo's custody.

Given "the state's strong interest in the expeditiousness and finality of juvenile dependency proceedings" (*In re Zeth S.* (2003) 31 Cal.4th 396, 412 (*Zeth S.*)), Arturo faces an uphill climb in asking that we effectively rewind the clock and start over from a hearing that occurred more than three years ago.  For three reasons we detail below, that climb is insurmountable in this case.

## I.    Procedural Bar

The Department argues that it is too late for Arturo to raise defects with the order terminating reunification services and setting the permanency planning hearing because the sole means of appellate review of that order is through an expedited writ procedure initiated immediately after the hearing.  (§ 366.26, subd. (l)(1)(A) & (l)(2); *In re Cathina W.* (1998) 68 Cal.App.4th 716, 719-720 (*Cathina W.*) ["direct appellate consideration of the propriety of the setting order may be had only by petition for extraordinary writ review of the order"].)  To be sure, and as Arturo argues, this rule does not apply where the juvenile court does not discharge its statutory duty to inform parents about this expedited writ procedure.  (*Cathina W.*, at p. 722; *In re Serenity S.* (2020) 55 Cal.App.5th 355, 370; see § 366.26, subd. (l)(3)(A); Cal. Rules of Court, rule 5.590(b)(1), (2).)  But the trial court here discharged its duty.

The necessary advisal to a parent may be sent by "first-class mail" "[i]f the party is not present" when the permanency planning hearing is set.  (Cal. Rules of Court, rule 5.590(b)(2).)

9

Here, the court records indicate that the court clerk sent Arturo, by first-class mail, "the Notice of Entry of the above minute order of September 3, 2019 and form(s)."  Because the minute order contained the necessary advisal regarding the writ procedure and the only relevant "forms" are the forms pertinent to that procedure, we may reasonably infer that the court clerk properly discharged its official duty in the absence of evidence to the contrary—and here, Arturo offers none.  (Evid. Code, § 664 ["It is presumed that official duty has been regularly performed."]; *Estate of Crabtree* (1992) 4 Cal.App.4th 1119, 1125 [section 664's "presumption applies to the duties of clerks of court"]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1213 [same].)

Because Arturo received proper notice of the expedited writ procedure but did not avail himself of it, he is not permitted to revisit those issues in this appeal from the order terminating his parental rights.  (*Cathina W.*, *supra*, 68 Cal.App.4th at pp. 719-720.)

## II.    Ineffective Assistance of Counsel

Even if we ignore the procedural bar, Arturo had nearly two years of time while still before the juvenile court to challenge any defects with the order terminating reunification services and setting the matter for a permanency planning hearing.  At any point during that time, Arturo could have filed a petition under section 388 to have the court reinstate reunification services or place Cassidy into his custody.  But he never did.  Thus, he ostensibly waived his right to do so.  (See, e.g., *In re Gilberto M.* (1992) 6 Cal.App.4th 1194, 1198 [parent's failure to raise issues before juvenile court despite opportunities to do so constitutes a waiver].)  Arturo responds that a finding that his inaction constitutes a waiver of his right to challenge the September 2019

order would violate due process because (1) Arturo, *individually*, had no reason to know he had a *basis* to object, and (2) Arturo's attorney was constitutionally ineffective for not filing a section 388 petition raising these issues.

We reject Arturo's first argument because he was personally aware of the facts underlying all of the defects he complains about now. Arturo continued to participate in the juvenile dependency proceedings for nearly two years after the September 2019 hearing. Arturo knew the September 2019 hearing happened, he (obviously) knew he was not present at it, and he had access to all the various reports. Thus, he was aware of the factual basis for the objections he now raises, and his failure to take action is properly considered.

We also reject Arturo's second argument that his counsel was ineffective for not filing a section 388 petition.

A parent in a dependency proceeding has a right to the effective assistance of counsel. (§ 317.5; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1659, 1662.) An attorney provides ineffective assistance only when (1) the attorney's "performance fell below the standard of reasonableness," and (2) "there is a reasonable probability that the result would have been more favorable if [the attorney] had provided adequate representation." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 254-255; *People v. Sanchez* (2019) 38 Cal.App.5th 907, 915 (*Sanchez*).) An attorney is not ineffective if he decides to "forgo a meritless" motion. (*Sanchez*, at p. 915.) However, because the question before us is *not* whether the section 388 motion would have been granted as the world existed whenever that motion might have been made between September 2019 and August 2021—but rather whether a such a motion might necessitate a hearing given the "child's

11

*current status*" and in light of the "entire factual and procedural history of the case"—whether a section 388 motion is meritless is to be examined by asking whether Arturo has made a "prima facie showing of prejudicial ineffective assistance." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1259-1260, overruled in part by *Zeth S.*, *supra*, 31 Cal.4th 396; *In re O.S.* (2002) 102 Cal.App.4th 1402, 1409 [same]; *In re Justice P.* (2004) 123 Cal.App.4th 181, 189 (*Justice P.*).) Because we must evaluate ineffectiveness in light of the entire record, we reject Arturo's argument that he need not show prejudice *at all* because we are confined to the record back in September 2019 (and that record did not contain the facts Arturo now offers). Arturo has not made out a prima facie showing that a section 388 motion to reinstate reunification services (thereby postponing a permanency planning hearing) or to place Cassidy back into his custody would have warranted a hearing. A juvenile court may convene a hearing on a section 388 motion only if the moving parent establishes a prima facie showing of (1) the existence of "new evidence" or a "change of circumstance," and (2) that altering the court's previous order is in the best interest of the child. (§ 388, subd. (a); *In re Stephanie M.* (1994) 7 Cal.4th 295, 316-317.)

Even if we assume that the defective notice before the September 2019 hearing or any of the other procedural defects Arturo identifies constitute "new evidence" (e.g., *Justice P.*, *supra*, 123 Cal.App.4th at p. 189), Arturo has not made a prima facie showing that altering the September 2019 order—by ordering additional reunification services or allowing Cassidy to be in Arturo's custody—would be in her "best interest" given Cassidy's current status. At this point in time, Cassidy has been in her maternal grandparent's sole custody for well over three

12

years, has only seen Arturo "sporadically" during that time period, and has never expressed a desire to reside with Arturo (and instead sees him as a "friend"). Transferring Cassidy to Arturo's custody at this time—when she is "safe" and "thriving" with the maternal grandparents—so she can for the first time develop a parental relationship with someone she has not lived with and has barely seen over the last several years is not in her best interest. Neither is giving Arturo more time for reunification, because Arturo appears to have made no effort to take any of the steps he was previously ordered to take; giving him more time to complete what he did not in two years even bother to start is not in Cassidy's best interests. These factors are relevant when assessing a child's best interest. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531-532 [factors relevant to the child's best interest under section 388 are (1) the seriousness of the problem that lead to dependency, (2) the strength of the child's bond with her new caretakers compared with the strength of the child's bond with the parent, and (3) the degree to which the problem leading to the dependency may be easily removed or ameliorated, and the degree to which it actually has been].)

Because Arturo cannot make a prima facie case for relief under section 388, any section 388 motion would have been summarily denied and his counsel's failure to make such a motion does not constitute ineffective assistance of counsel.

## III. Direct Challenge to September 2019 Order

Even if we were to ignore the procedural bar as well as the waiver effected by Arturo's inaction—and to treat this appeal as a direct appeal of the juvenile court's order terminating reunification services and declining to place Cassidy back in

13

Arturo's custody—Arturo still would not prevail.  Arturo is nonoffending and, by the time of the September 2019 hearing, noncustodial.  As to a presumed parent like Arturo, a juvenile court may not terminate his parental rights without finding, by clear and convincing evidence, that awarding him custody of Cassidy would be "'detrimental'" to her.  (*In re D.H.* (2017) 14 Cal.App.5th 719, 730.)  This is admittedly a "'fairly high'" bar.  (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505.)  Even so, awarding Arturo custody of Cassidy—even looking at the record only up to September 2019—would have cleared this high bar of detriment.  By that point in time, she had been out of Arturo's custody nearly 18 months, he was only sporadically visiting her, his housing was unstable, and she was safe and doing well in her maternal grandparents' custody.  These are all relevant factors (*In re T.G.* (2013) 215 Cal.App.4th 1, 21-22), and establish that the juvenile court's ruling was supported by substantial evidence and not otherwise an abuse of discretion.

**DISPOSITION**

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

CHAVEZ


15