Filed 9/14/21 In re A.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. K.B. et al., Defendants and Appellants. | E076368 (Super.Ct.Nos. J272350 & J272352) OPINION |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant, K.B.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant, S.V.

Michelle D. Blakemore, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent

## I. INTRODUCTION

Appellants S.V. (Father) and K.B. (Mother) are the parents of two girls, A.V. and A.M., born, respectively, in August 2011 and October 2015. The girls were adjudicated dependents of the juvenile court, along with Mother's third child, N., who was later placed with his father and is not a subject of this appeal. The parents appeal from the December 15, 2020 orders terminating their parental rights to the girls and selecting adoption as the girls' permanent plan. (Welf. & Inst. Code, § 366.26.)[1]

Father claims the court violated his due process rights by terminating parental rights without finding, based on clear and convincing evidence, that he was an "unfit" parent or that placing the girls in his care would be detrimental to them. He claims the court terminated his parental rights based solely on his poverty, specifically his inability to obtain suitable housing for the girls. The record does not support this claim.

Father obtained suitable housing for the girls several months before the section 366.26 hearing. The court expressly stated that it was terminating parental rights based on Father's failure to protect the girls, not based on his poverty. The record supports the court's implied finding at the section 366.26 hearing that it would be detrimental to the girls to place them in Father's care. Among other things, Father allowed his girlfriend and Mother to attend his unsupervised visits with the girls, and the

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

girlfriend and Mother argued, yelled, and swore at each other in front of the girls. Both Mother and girlfriend had active dependency cases pending against them at the time Father allowed them to attend his unsupervised visits. Father also drove the girls around without a valid driver's license or appropriate car seats.

Mother claims the court abused its discretion in determining that the parental-benefit exception to the statutory preference for adoption did not apply. (§ 366.26, subd. (c)(1)(B)(i).) Mother further claims, for the first time in this appeal, that the court erroneously failed to consider the girls' relationship with N. in terminating parental rights. We find no merit to the parents' claims and affirm the section 366.26 orders.

## II. BACKGROUND

A. *Initial Detention and Investigation* (*June to Aug. 2017*)

The family first came to the attention of CFS on June 5, 2017, when a referral alleged that Mother was generally neglecting N., who at that time was nearly age four. Several months earlier, Mother left N. in the care of W., the girlfriend of N.'s paternal uncle, telling W. that she would return in a few hours, but she did not return. Mother later told W. it was better for N. to stay with W. because, with Mother, he would be moving around too much.

W. reported that Mother was living in motel rooms, engaging in prostitution, and would lock N. and the girls in rooms or make them sit outside of rooms for hours while Mother engaged in prostitution. According to W., Mother had never been stable. And, although Father appeared to care for N. as well as his own children, the girls,

W. suspected there was "drug use" in Father's home. Later, during June 2017, Mother was arrested and incarcerated for prostitution.

On June 29, 2017, Father met with a social worker for a scheduled appointment and brought A.V. and A.M. with him. Father said he had been living in a motel room for around six weeks, denied any drug use, and denied being in a relationship with Mother. Father reported that, before Mother was arrested, the girls were with Mother as often as they were with Father, and Father would leave the girls with their paternal grandmother while he commuted to Laguna Beach to work in construction.

When asked to drug test the next day, Father admitted he might test positive for marijuana, which he used once or twice weekly but not around the girls. A.V. told the social worker in private that she felt safe with Father, and Father took care of her. A.V. knew that Mother was in jail, but she did not know why, and said she was worried about Mother. Father failed to drug test, as requested, on June 30 and July 3, 2017. On July 14, the social worker went to the motel room where Father said he had been staying, but she discovered there was no such motel room number, and Father was not registered at the motel. The social worker was unable to reach Father despite numerous attempts to contact him.

On August 4, 2017, the social worker confirmed that Mother was no longer incarcerated and spoke to Mother by phone. Mother said the children were with her and would be staying with their maternal grandmother (the MGM) in Yucaipa. On August 10, the social worker met with the MGM, Mother, and the three children. The

4

MGM and Mother were renting a room in a home, and the children were staying in the home with them.

Mother said she used to " 'smoke dope,' " but she had been clean since her arrest. When told she would need to drug test for CFS, Mother expressed concern that she would test positive for marijuana and amphetamines. Mother had papers from a hospital, showing that she had recently been treated for "stimulant use disorder" and anxiety, and she had tested positive for amphetamines and benzodiazepines on August 2, 2017. When told that amphetamines were not within the class of drugs she had been prescribed, Mother offered no explanation for her positive test for amphetamines. Mother and the MGM agreed to a safety plan for the children.

On August 17, 2017, the social worker went back to the home where Mother, the MGM, and the children were living. The homeowner reported that Mother had been away from the home since the previous day. According to the MGM, Mother left the previous day, saying she was going to drug test, but she did not return home, and the MGM did not know her whereabouts. The social worker obtained a detention warrant and placed the children in foster care with Ms. H.

On August 21, 2017, CFS filed dependency petitions for the girls,[2] alleging Mother had an unstable and unsafe lifestyle, which placed the children at risk of abuse and neglect, and a substance abuse problem, which prevented Mother from adequately parenting the children. (§ 300, subd. (b).) The petitions for the girls further alleged that

---

[2] The petition for N. is not part of the record on appeal.

Father had a history of substance abuse, as evidenced by his criminal history, which placed the girls at risk of abuse or neglect (§ 300, subd. (b)), and that Father's ability to parent and support the girls was unknown, given that his whereabouts were unknown (§ 300, subd. (g)).

On August 22, 2017, the parents were present at the detention hearing, and the court ordered all three children detained. The court found there was a substantial danger to the children and no reasonable means of protecting them unless they were removed from parental custody. Mother and Father were ordered to drug test. Father requested presumed father status for the girls.

B. *Jurisdiction and Disposition* (*Sept. 2017*)

On September 12, 2017, the parents were present for a jurisdiction and disposition hearing. At this time, A.V. was age six and A.M. was nearly age two. Mother failed to drug test on four days in August 2017 and was observed prostituting on September 6. Father failed to drug test on August 22. Neither Mother nor Father had returned numerous calls from CFS and were unavailable to be interviewed for CFS's report. But the parents visited the girls on August 26 and September 2, with no concerns.

CFS recommended the court find the petitions' allegations true, remove the children from parental custody, and offer Mother reunification services. CFS further recommended that Father be found to be the alleged father of the girls but also recommended that Mother and Father be referred for counseling, parenting classes, and substance abuse treatment. Father requested mediation regarding CFS's recommendation to find him an alleged father and offer him no reunification services. The court ordered

6

the parents to drug test, scheduled a mediation, and continued the jurisdiction and disposition hearing.

Mother tested positive for amphetamines and marijuana on September 12, 19, and October 11, 2017. When interviewed on September 18, Mother denied having a substance abuse problem and claimed the children were " 'always safe' " because, when she used drugs, the children were either with Father or with one of their grandmothers. Father failed to drug test as ordered on September 12 and missed a September 19 appointment with the social worker. When interviewed by telephone on October 23, Father claimed his "drug[s] of choice" had been methamphetamines and marijuana, but he claimed he had last used the drugs around one year earlier.

At the mediation on October 24, 2017, the parties stipulated to the truth of the section 300 subdivision (b) allegations against Mother and Father, and they agreed to dismiss the section 300, subdivision (g) allegation against Father. The parents also agreed to complete CFS's proposed case plan, which for both parents included individual counseling, substance abuse treatment and testing, and parenting education. In an addendum report, CFS asked the court to find that Father was the girls' presumed father.

At the continued jurisdiction hearing on December 12, 2017, the court found the section 300, subdivision (b) allegations against the parents true pursuant to the parties' stipulation, declared the girls dependents, and ordered them removed from parental custody. The court found by clear and convincing evidence that there was a substantial risk of danger to the girls if they were returned to the parents. Father was found to be the girls' presumed father, and Mother and Father were granted weekly, two-hour supervised

visits with the girls. In January 2018, the girls were removed from their foster care placement with Ms. H. and placed with a maternal aunt, Ms. B.

C. *The Six-month Review* (*June 2018*)

Mother and Father were present at the six-month review hearing on June 12, 2018. CFS initially reported that Mother had failed to attend any parenting classes and had inconsistently attended her counseling sessions. She had last attended a counseling session in November 2017, and her therapist reported that she had made no progress. She was not drug testing because she said she knew she would test positive. Although she was moderately consistent with visitation, she became overwhelmed and frustrated during visits, and appeared to "make the visits about her feelings rather than the children's needs." Mother was inattentive during visits and lacked parenting skills. In March 2018, Mother was arrested for receiving stolen property. At the June 12, 2018 hearing, CFS changed its recommendation for Mother and asked the court to grant Mother six additional months of services, given that, around one month earlier, Mother began engaging in counseling.

CFS recommended six additional months of services for Father. CFS reported that Father was initially slow to engage in his services, but he was currently in inpatient treatment for substance abuse. He had begun testing negative for controlled substances in March 2018, and he had attended six of eight scheduled therapy sessions, and six of 12 parenting classes. He had reportedly made "minimal progress" in his parenting education and individual counseling. He also lacked "a positive support system," and CFS was concerned that he would relapse after he completed his inpatient treatment. He

8

initially missed many of his supervised visits with the girls and left some of the visits early due to being tired; but, by April 2018, he began consistently attending his weekly visits, and he engaged with the girls throughout the visits.

During some of their joint visits with the girls, Mother and Father would argue regarding parenting styles. Mother also had difficulty redirecting N. during visits. As a result, CFS assigned a "visitation center coach[]" to attend the parents' visits. The visitation coach noted that Mother demonstrated a lack of parenting skills, would become irritated at N.'s temper tantrums, once "raised her hand" and almost struck N., and seemed overwhelmed with the children.

Mother's interactions with the children subsequently improved. During a March 6, 2018 visit, the children " 'appeared to respond positively to the collective interactions' " with Mother, and Mother " 'appeared to remain positively engaged' " with the children. The visitation coach reported that Mother was able to "use time management" and "transitional warnings" with the children.

Mother arrived late for her March 17, 2018 visit because it was a new location, and Mother had not been there before. When the visitation coach threatened to cancel the visit due to Mother's late arrival, A.M. began to cry and said she missed Mother. The visit was allowed to proceed.

At the June 12, 2018 hearing, the court adopted CFS's recommendations and granted the parents six additional months of services. The court found that returning the girls to parental custody would be detrimental to them. The court amended the parents' service plans to address domestic violence through individual counseling and to

determine whether it was necessary to require the parents to complete a domestic violence program. Visitation for Mother and Father was unchanged: supervised, weekly, for two hours.

D. *The 12-month Review* (*Oct. 2018*)

Mother and Father were present at the 12-month review hearing on October 3, 2018. CFS recommended terminating Mother's services and granting Father further services. Although Mother had completed 10 of 12 parenting classes, she had not engaged in outpatient substance abuse treatment, she had missed numerous drug tests, and she had tested positive for marijuana and methamphetamines on August 3, 2018.

Father had successfully completed his individual counseling, a parenting program, and his inpatient substance abuse treatment program. Father's therapist reported that Father recognized the risks that his substance abuse and his prior relationship with Mother had posed to the girls. Father had no plans to reconcile with Mother. He tested negative for controlled substances on June 6, 2018, but he missed drug tests in July and August 2018. He was ordered to drug and alcohol test on October 3, 2018, and he was authorized to have unsupervised visits with the girls if he continued to test negative. Due to his 5:00 a.m. to 5:00 p.m. work schedule, he was authorized to drug test at a different location that was open after 5:00 p.m.

The October 3, 2018 hearing was continued to October 17. On October 12, CFS reported that Father tested negative for controlled substances on October 3 and was to begin unsupervised visits on October 13. Father was renting a room in a house, but the

10

house was small and CFS reported it would not authorize Father to have overnight visits with the girls unless he obtained his own residence.

On October 17, 2018, Mother was not present in court, and the court terminated her services. CFS was authorized to grant Father overnight visits, by approval packet, if he obtained a suitable residence for the girls. The court found that returning the girls to the parents would be detrimental to them. N. was returned to his father pursuant to a family maintenance plan.

E. *The 18-month Review* (*May 2019*)

At the 18-month review hearing on February 19, 2019, CFS recommended that Father's reunification services be terminated but that Father receive services pursuant to a planned permanent living arrangement (PPLA) for the girls, with the goal of returning the girls to Father. CFS reported that Father had completed his case plan, had "taken responsibility for his actions," and had "mitigated" CFS's concerns. But Father was still looking for suitable housing so he could take the girls into his care. He was living with two roommates in San Bernardino. He told CFS he was having a difficult time finding a suitable residence because he had two prior evictions. The parties agreed to continue the hearing to see whether Father could obtain suitable housing, and the hearing was continued to April 9, 2019.

On April 8, 2019, CFS reported that Father had been approved for a two bedroom, one bathroom apartment, and that CFS had given Father a voucher toward his first month's rent and deposit on the apartment. CFS planned to provide father with furnishings, beddings, and other provisions for the apartment and the girls, in the event

11

the girls were returned to Father, pursuant to a family maintenance plan. The apartment was currently occupied, but it was expected to be vacated by April 11. The matter was continued to May 20.

On May 10, 2019, CFS reported that Father was expected to move into the apartment on May 12, and that CFS would assess the apartment after Father moved in. On May 16, the apartment manager reported that the apartment's former tenants had vandalized the apartment, and that Father would not be able to move in until May 26; the apartment manager moved Father's move-in date to June 7, at the earliest. At the continued hearing on May 20, the parties agreed that Father's housing was the only impediment to his beginning overnight and weekend visits with the girls. On May 1, Father tested negative for all controlled substances.

On May 20, 2019, the court terminated Father's reunification services but placed the girls in a PPLA, with the goal of returning them to Father, and offered Father services pursuant to the PPLA. Again, the court found it would be detrimental to the girls if they were returned to Father. Father was granted unsupervised, weekly, five-hour visits. Mother's visits remained unchanged as supervised, weekly, two-hour visits. A permanency planning review hearing was scheduled for November 20.

F. *The Permanency Planning Review* (*July 2020*)

On July 23, 2019, CFS reported that Father was unable to move into the apartment as planned, and the apartment building had been sold. On November 15, CFS recommended that the court set a section 366.26 hearing to change the girls' permanent

12

plan to adoption and terminate parental rights. The girls' current caretaker, their maternal aunt, Ms. B., was able and willing to adopt the girls.

During the review period, Father had unsuccessfully continued to search for suitable housing. Around September 2019, Father moved into a sober living home, closer to his place of employment. Since May 2019, Father had tested negative for controlled substances seven times and had failed to test four times—two of his failures to test were "no shows," one was based on his failure to provide a sufficient testing sample, and one was based on his failure to provide any sample.

On November 20, 2019, the court set a contested permanency planning review hearing on February 11, 2020. On January 27 and February 3, 2020, Mother filed section 388 petitions seeking further reunification services and the return of the girls to her care. The petitions were summarily denied.

On February 11, 2020, the court continued the hearing to April 24, in order to allow CFS additional time to assess Father's new home. Father had recently obtained housing with Mr. T. Only one day earlier, on February 10, CFS prepared a report stating that Father continued to test negative for controlled substances and was complying with the terms of his sober living home. The manager of the sober living home described Father as "hardworking" and "easy going." CFS further stated that the girls had been living with their maternal aunt, Ms. B., for two years, and that Ms. B. was still willing to adopt the girls. The girls were bonded to Ms. B., called her " 'Mommy,' " and Ms. B. felt that the girls were "thriving" in her home.

13

According to Ms. B., the girls had been having "behavioral issues" during their visits with Father. Thus, on February 10, 2020, CFS recommended that the court terminate parental rights and change the girls' permanent plan to adoption. The April 24 permanency planning review hearing was continued to July 6, pursuant to the Judicial Council's March 2020 emergency orders related to the COVID-19 pandemic.

On July 6, 2020, CFS reported that A.V. had said that Mother had been present during several of Father's unsupervised, five-hour, weekly visits with the girls. According to A.V., Mother would call Father or Father would call Mother, in order to have Mother attend Father's unsupervised visits, even though Mother's visits had been ordered supervised. This had been happening since A.M.'s birthday party in October 2019, when Father invited Mother to the party, and Father's girlfriend, T., was also present at the party. At the party, Mother and T. argued, yelled, and cursed at each other, making A.V. "sad and uncomfortable."

According to A.V., either Mother or T. was present at all of Father's unsupervised visits with the girls. The social worker discovered that T. had an open CFS case, and that T.'s children had been removed from her care. In addition, Father was driving the girls around without a valid driver's license or appropriate car seats. On March 19, 2020, the social worker discussed these concerns with Father. Father initially denied the concerns but later called the social worker and admitted the concerns, while minimizing and making excuses for his decisions.

Due to the COVID-19 pandemic, Father's visits were restricted to video-call visits. On June 10, 2020, A.V. ended a video-call visit with Father, almost an hour early,

because she was "very upset" with Father and called him a liar. Father had previously told A.V. that he and T. were no longer together, but A.V. saw T.'s children in the background during a video-call visit. A.V. said she would become frustrated and upset when Father brought other people, including "random people" whom she did not know, into the video-call visits. Father had also previously told the social worker that he and T. were no longer together because their relationship was affecting T.'s ability to get her children back from CFS. Father initially denied that T. and her children were with him during the June 10 video-call visit, but he later called the social worker and admitted that this was true.

On June 25, 2020, the social worker met with Father to assess his one-bedroom apartment. By this time, Father was no longer living with Mr. T. Father moved to the apartment on May 15, 2020, and his mother lived in a nearby apartment. Father's apartment was appropriate, clean, and safe. There were bunk beds and child bedding in the bedroom for the girls, and Father slept on a sofa bed in the living room.

Father had been inconsistent with his video-call visits; he would not call the girls on time, the girls would wait for him to call for up to 45 minutes, and sometimes he would not call the girls at all. A.V. said she felt "less important" to Father or that Father did not care when he interacted with other people during their video-call visits. A.V. said she did not trust Father and believed he treated T.'s children better than he treated A.V. and A.M. Ms. B. had given A.V. and A.M. Christmas presents, but Father took them away and gave them to T.'s children, still wrapped. The social worker discussed these concerns with Father.

15

In its July 6, 2020 report, CFS stated it was concerned about Father's "protective capacity, poor judgment, [and his] minimizing and not complying with court orders." In addition, Father had an outstanding arrest warrant in San Bernardino County "for dangerous drugs." Father had been ordered to drug test a total of eight times since the February 11, 2020 hearing, and he had tested negative four times, failed to show up three times, and failed to provide a sample on one occasion. CFS determined, "based upon the SDM Reunification Assessment," that the children were "not safe" to return home to Father, and "the risk level was 'very high.'" Thus, CFS recommended the court change the girls' permanent plan to adoption and terminate parental rights.

At the July 6, 2020 review hearing, Mother and Father objected to the court setting a section 366.26 hearing but offered no affirmative evidence. Based on CFS's reports, the court set a section 366.26 hearing. The court ordered each parent's visitation to be supervised, and it reduced the frequency of the visits to twice monthly for two hours. The section 366.26 hearing was later continued to December 15.

G. *The Section 366.26 Hearing* (*Dec. 15, 2020*)

On October 21, 2020, CFS filed a section 366.26 report, continuing to recommend that the parental rights be terminated and that the girls be placed for adoption. The girls had been living with Ms. B. since January 2018, their second placement since they were taken into protective custody in August 2017 and were placed in foster care. The girls had an "emotional connection" and a "mutual attachment" with Ms. B. and her children, and they referred to Ms. B. as "'Mom.'" A.V. appeared to understand the concept of adoption and said she wanted to remain in Ms. B.'s care. The girls had no

16

developmental, medical, or educational concerns. CFS opined that both girls were adoptable due to their young ages, their bond with Ms. B., and their need for permanency.

Due to COVID-19 restrictions, the parents were still limited to video-call visits, and Ms. B. had been supervising the visits. CFS reported that the parents had been inconsistent with the visits; they would not call the girls, and when they did, the girls would terminate the visit after 30 minutes to an hour.

Mother and Father were present at the section 366.26 hearing on December 15, 2020. At the time of the hearing, A.V. was age nine and A.M. was age five. Mother testified that she and Father had lived separately before the girls were removed from their care, but they had both supported the girls. Mother had only missed one visit with the girls since their removal in August 2017. Mother said it was difficult to keep A.M.'s attention during the video-call visits. During Mother's more recent, in-person visits with the girls in a park, the girls would run up to Mother, jump on her, and call her " 'Mommy.' "

Mother claimed the girls had been instructed to call Ms. B. " 'Mom.' " Mother noted that the girls had also called their former foster mother " 'Mom.' " Mother and Ms. B. did not "get along" either currently or while they were growing up. During the in-person park visits, Mother brought the girls food and gifts, played games with them, and asked them how they were doing in school. Ms. B. did not allow Mother to give the girls advice. Mother said she preferred the girls to be placed in a guardianship with Ms. B., so that she could continue to "better" herself and get the girls back in the future.

17

Father testified he did not agree with CFS's recommendation to terminate parental rights. He explained that he had complied with everything he had been asked to do; he had completed his case plan; he loved the girls; and he wanted the girls to be with him. He had been unable to visit the girls, via video-calls, since before November 2020 because he had lost his phone. But, before that, he had consistently visited the girls every two weeks—as the court's order allowed. The girls called him " 'Dad,' " and he knew that the girls loved him. Father also testified it was difficult for him to interact with the girls through a screen, and he had a difficult time sitting down "for two hours straight" and concentrating on one thing. Father believed it would be emotionally harmful for the girls not to have contact with him, and the lack of contact would affect his future relationship with the girls. Like Mother, Father wanted the girls to be placed in a guardianship, which would give him an opportunity to get the girls back in the future.

Following counsel's arguments, the court found that the girls were both generally and specifically adoptable. The court then stated: "The burden then shifts to the parents to prove the beneficial-relationship exception, and I will state that homelessness is not a reason to terminate parental rights. I would never do that. That's not the court's intent in this particular case. There are other issues that led us here. With regards to Dad, I just want that accurate for the record. I wouldn't be holding that against any parent. I think homelessness would be the reason for a lesser plan. Unfortunately, in this situation, it's not the homelessness issue that, by Dad's statements, have been resolved anyway, so that is not a factor in the court's decision. It's more to do with his protective capacity." The deputy county counsel pointed out that, since Father's visits were ordered supervised

after he allowed his girlfriend and Mother to attend his unsupervised visits and to argue in front of the girls, Father had not offered the court any "corrective type of information warranting a return to unsupervised visits."

Counsel for both parents argued that the parental-benefit exception to adoption applied, but the court found that the exception did not apply. (§ 366.26, subd. (c)(1)(B)(i).) Although the court found that the parents had consistently visited the girls, they had not occupied parental roles in the girls' lives for at least three years, and they were more like "friendly visitors." The court further determined that the benefits to the girls of adoption outweighed the benefits of maintaining a relationship with the parents. Thus, the court terminated parental rights and changed the girls' permanent plan to adoption. Mother and Father timely appealed the section 366.26 orders.

III. DISCUSSION

A. *The Court Did Not Abuse Its Discretion in Determining that the Parental-benefit Exception to Adoption Did Not Apply to Mother's Relationship with the Girls*

Mother claims the juvenile court abused its discretion in declining to apply the parental-benefit exception to the adoption preference to Mother's relationship with the girls. (§ 366.26, subd. (c)(1)(B)(i).) Mother claims that all of the evidence before the court at the time of the section 366.26 hearing showed that the parental-benefit exception applied to Mother's relationship with the girls. Thus, Mother claims the court erroneously terminated parental rights and placed the girls for adoption, and that the court should have instead placed the girls in a guardianship with Ms. B. We conclude that the

19

court did not abuse its discretion in ultimately determining that the parental- benefit exception did not apply.[3]

    1.  <u>Applicable Legal Principles and Standard of Review</u>

At a section 366.26 hearing, the juvenile court selects a permanent plan for the dependent child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296; § 366.26, subd. (b)(1)-(7).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) A permanent plan of adoption necessarily involves termination of the biological parents' parental rights to the child. (*Id.* at p. 574.)

In selecting a permanent plan for the child, the court is first required to determine whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If the court finds, based on clear and convincing evidence, that the child is likely to be adopted, and if there has been a previous court determination, by a preponderance of the evidence, that it would be detrimental to the child to return the child to his or her parent or guardian (§§ 366.21, 366.22), then the court is required to terminate parental rights and select adoption as the child's permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under at least one of several statutory exceptions to the adoption preference. (*Cynthia D. v. Superior Court* (1993)

---

[3] Father joins Mother's claim, without additional argument. (Cal. Rules of Court, rule 8.200(a)(5).) Father claims only that, if this court reverses the termination of Mother's parental rights, then this court must also reverse the termination of Father's parental rights.

5 Cal.4th 242, 249; § 366.26, subd. (c)(1)(B)(i)-(vi).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The parental-benefit exception applies where the court finds a "compelling reason" for determining that termination of parental rights would be detrimental to the child because, in the words of the statute, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Our Supreme Court recently clarified the proper application of the parental-benefit exception and, in doing so, discerned "three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child *such that* (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*), fourth italics added.) As *Caden C.* indicates, the second and third elements of the exception are inextricably connected.

The *Autumn H.* court recognized this connection when it interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child *to such a degree as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a

21

substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, 27 Cal.App.4th at p. 575, italics added.)

We review the juvenile court's findings on the first two elements of the parental-benefit exception for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) "The determination that the parent has visited and maintained contact with the child . . . is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Ibid.*) The third element—whether termination of parental rights would be detrimental to the child—is "somewhat different" in that it requires the court to "assess[] what the child's life would be like in an adoptive home without the parent in his life." (*Id.* at p. 640.) "The court makes the assessment by weighing the harm [to the child] of losing the relationship against the benefits [to the child] of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with the parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

A court abuses its discretion only when it " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) A reviewing court should find an abuse of discretion, "only ' "if " ' " it finds that no judge could reasonably have made the decision that the judge did, when all of the evidence is viewed most favorably in support of the judge's decision. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

2. <u>Analysis</u>

Mother claims the evidence at the time of the section 366.26 hearing "established" that Mother had a "significant, compelling, and substantial" relationship with the girls, such that the continuation of that relationship outweighed any benefit that the girls would realize through adoption. Thus, Mother claims the court abused its discretion in concluding that the benefits the girls would realize from adoption outweighed any harm or detriment the girls might suffer from the termination of their relationship with Mother. We find no such abuse of discretion.

We begin by noting the first element of the parental-benefit exception is not in issue, given the court's finding that Mother maintained regular visitation and contact with the girls. Mother also met her burden of proving the second element of the exception. That is, Mother showed she had a "relationship" with the girls, "such that" the girls "would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) The court's finding that Mother did not occupy a "parental role" in the girls' lives and was more like "a friendly visitor" does not mean that Mother did not have "a relationship"

with the girls that was at least to some degree beneficial to the girls.[4]  (*Id.* at pp. 628, 631-632, 639-640.)

And, indeed, the record shows that Mother had a relationship with the girls that was, at least to some degree, beneficial to the girls.  As Mother points out, the girls called her " 'Mommy,' " were happy to see her during visits, and had been in her care, for approximately the first two years and six years of their respective five- and nine-year-old lives.  Mother brought food and gifts to the girls during her in-person visits, interacted with the girls, engaged them in activities, and talked to them about how they were doing in school.

Mother claims she "grew as a parent" during the course of her visits, and we agree.  Mother was initially overwhelmed and frustrated during visits—particularly with

---

[4] In applying the parental-benefit exception, courts have traditionally required the parent to show that the parent occupies a " 'parental role' in the child's life." (E.g., *In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)  This required showing is based on *Autumn H.*, where the court observed that, "[t]he exception applies only where the court finds regular visits and contact have continued or developed *a significant*, *positive*, *emotional attachment from child to parent*." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, italics added; e.g., *In re Derek W.*, at p. 827; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.)

In light of *Caden C.*, a parent is no longer required to show that the parent occupied a "parental role" in the child's life.  In discussing the parental benefit exception, *Caden C.* did not mention that the parent is required to show that the parent occupies a parental role in the child's life. (*Caden C.*, *supra*, 11 Cal.5th at pp. 631-632.)  To the contrary, in discussing the second element of the exception, *Caden C.* emphasized that the focus is on the child, and that courts "assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*Id.* at p. 632.)  Among other things, the court observed that " 'parenting styles and relationships differ greatly between families,' " and that *Autumn H.*, which guided the court's analysis of the exception, " 'does not narrowly define or specifically identify the type of relationship necessary to establish the exception.' " (*Caden C.*,  at pp. 632-633.)

24

N.'s temper tantrums, but with the assistance of the visitation coach, Mother learned to better manage her time and to provide "transitional warnings" to the children. Mother also claims she did the best she could to maintain her relationship with the girls, given her limited visitation rights and her restriction to video-call visits during the COVID-19 pandemic. This is not disputed.

But despite Mother's consistent visitation and contacts, her improving parenting skills, and her beneficial relationship with the girls, the juvenile court did not abuse its discretion in ultimately concluding that the benefits the girls would realize from adoption outweighed any harm or detriment the girls might suffer from the termination of parental rights and the termination of the beneficial girls' relationship with Mother. The girls were ages five and nine at the time of the section 366.26 hearing. Mother does not challenge the court's finding that the girls were both generally and specifically adoptable, particularly by Ms. B. The girls shared a mutual bond with Ms. B. and her children, and the girls had no developmental, medical, or educational concerns. The girls had been in Ms. B.'s care since January 2018, and Ms. B. was willing to adopt them. The girls looked to Ms. B. as their primary caretaker and called her, " 'Mom.' " The girls needed permanency and stability, which Ms. B. was able to provide.

Most significantly, the court reasonably determined that neither of the girls would be "greatly harmed" by the termination of their relationships with Mother. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Although the girls enjoyed a relationship with Mother that was beneficial at least to some degree, the girls' need for the permanency and stability was paramount. Mother's visits never progressed to unsupervised, and Mother

25

continued to struggle with the issues that, for her part, led to the girls' dependency  Thus, on this record, the court reasonably determined that the benefits to the girls of being adopted outweighed any harm or detriment the girls might suffer from the termination of their beneficial relationships with Mother.

At oral argument, Mother's counsel argued that the court's finding that Mother did not occupy a parental role in the girls' lives and was more like "a friendly visitor" shows that the court "cast aside" or too readily dismissed the evidence that Mother had a beneficial relationship with the girls.  Mother's counsel further argued that the court's misplaced emphasis on Mother's lack of a parental role adversely affected the court's ultimate determination that the girls would benefit *more* from adoption than they would benefit from continuing their beneficial relationship with Mother.  We disagree.  Despite the court's emphasis on Mother's failure to occupy a parental role in the girls' lives, the court appropriately balanced the girls' interest in stability and permanency against any harm the girls might suffer from the termination of their relationship with Mother.  Ultimately, the court reasonably concluded that the girls would benefit more from adoption than from maintaining their beneficial relationship with Mother.  Thus, the court did not abuse its discretion in determining that the parental benefit exception did not apply to Mother's relationship with the girls.

3. <u>Mother Has Forfeited Her Sibling-Relationship Exception Claim</u>

As part of her claim that the court erroneously refused to apply the parental-benefit exception, Mother incidentally claims the court erroneously failed to consider the girls' relationship with N. before the court terminated parental rights.  Courts have

recognized that " ' "maintaining [sibling] relationships, under the right circumstances, is imperative for the emotional well-being of the [dependent] child now and in the future." ' " (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1003.) Mother also points out that CFS erroneously reported that the girls did not have any siblings.

To be sure, CFS's section 366.26 report, dated November 3, 2020, states, "Sibling Relationship Considerations: [¶] The children are placed together. There are no other known siblings." But the court was well aware that the girls had a half-sibling, N., because the court placed N. with his father pursuant to a family maintenance plan in October 2018. Additionally, CFS's earlier reports show that the girls and N. were taken into protective custody together and were placed in foster care together in August 2017. But, in January 2018, the girls and N. were placed in different foster homes.

The record does not indicate that any of the parties, including Mother, Father, or minors' counsel, claimed at any point after January 2018 that the girls and N. should remain together. And, because Mother did not raise the sibling-relationship exception to the adoption preference (§ 366.26, subd. (c)(1)(B)(v)) at the section 366.26 hearing, she may not raise it for the first time on appeal. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 402-403 ["If a parent fails to raise one of the exceptions at the hearing, not only does this deprive the juvenile court of the ability to evaluate the critical facts and make the necessary findings, but it also deprives this court of a sufficient factual record [to evaluate the juvenile court's findings and determinations regarding the exception.]"].)

B. *Father's Parental Rights Were Not Terminated Based on His Poverty and Substantial Evidence Supports the Court's Multiple Detriment Findings as to Father*

Father claims the juvenile court violated his Fourteenth Amendment due process rights in terminating his parental rights at the section 366.26 hearing because the court "did not and could not make a finding of parental unfitness in this case." Additionally, at oral argument, Father argued that the multiple findings of child detriment that are required to be made in the course of a dependency proceeding, before parental rights may be terminated at a section 366.26 hearing, were not made in this case.

We find no merit to this claim. As we have explained in detail, the court made multiple findings, throughout these dependency proceedings, that returning the girls to Father's care would be detrimental to the girls. Substantial evidence supports these findings, including the court's ultimate implied finding of detriment at the section 366.26 hearing. Thus, the court did not violate Father's due process rights in terminating Father's parental rights at the section 366.26 hearing.

1. Applicable Legal Principles

Parents have a fundamental liberty interest in the care, companionship, custody, and management of their children. (*Santosky v. Kramer* (1982) 455 U.S. 745, 758-759 (*Santosky*); *In re B.G.* (1974) 11 Cal.3d 679, 688.) "*Santosky* establishes minimal due process requirements in the context of state dependency proceedings." (*In re Gladys L.* (2006) 141 Cal.App.4th 845, 848.) That is, in state dependency proceedings, parents have a due process right to have the state find, based on clear and convincing evidence,

28

that the parent is an "unfit" parent, before the state may terminate the parent's parental rights to the dependent child. (*Santosky*, at pp. 747-748; *In re Gladys L.*, at p. 848.)

California's dependency scheme no longer uses the term "parental unfitness" or requires courts to make findings of parental unfitness before the court terminates parental rights at a section 366.26 hearing. (*In re Cody W.* (1994) 31 Cal.App.4th 221, 225.) Instead, the juvenile court is required to make multiple findings, before the section 366.26 hearing, that are equivalent to a finding of parental unfitness. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222-224.) A finding that it would be detrimental to a child to return the child to the child's parent is equivalent to a finding of parental unfitness under California's dependency scheme. (See *In re Cody W.*, at pp. 224-226.)

Our Supreme Court has held that section 366.26 satisfies *Santosky's* due process requirements, given the multiple procedural steps that must occur, and the multiple judicial findings that must be made, before a section 366.26 can take place. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 255-256 (*Cynthia D.*).) The *Cynthia D.* court explained: "Considered in the context of the entire process for terminating parental rights under the dependency statutes, the procedure specified in section 366.26 for terminating parental rights comports with the due process clause of the Fourteenth Amendment *because the precise and demanding substantive and procedural requirements the petitioning agency must have satisfied before it can propose termination are carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents.* At this late stage in the process the evidence of detriment is

29

already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must now align itself. Thus the proof by a preponderance standard is sufficient at this point." (*Id*. at p. 256, italics added.)

At the time of the dispositional hearing, the juvenile court may not order a child removed from a noncustodial parent's custody unless the court finds there is "clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to parental custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody." (§ 361, subd. (d); see *In re S.S.* (2020) 55 Cal.App.5th 355, 373.) At the dispositional hearing for the girls on December 12, 2017, the court found it would be detrimental to the girls to place them with Mother or Father, when it ordered the girls removed from parental custody. (Former § 361, subd. (b).)

At the six-, 12-, and 18-month review hearings on June 12 and October 17, 2018, and May 20, 2019, the court expressly found based on a preponderance of the evidence— the evidentiary standard under the applicable review hearing statutes—that returning the girls to Father would be detrimental to the girls. (§§ 366.21, subds. (e), (f), 366.22, subd. (a)(1).) To be sure, the court did not make express detriment findings at the July 6, 2020 permanency review hearing, or at the December 15, 2020 section 366.26 hearing. But at the section 366.26 hearing, the court expressly stated that it was not terminating parental

rights based on Father's poverty but based on Father's poor judgment and failure to protect the girls during Father's unsupervised visits with the girls in and after October 2019.

2. Analysis

As Father acknowledges, the court made detriment findings, in accordance with the applicable statutes, at the dispositional hearing in December 2017 and at the 6-and 12- month review hearings in June and October 2018. Father does not challenge the sufficiency of the evidence supporting these detriment findings. Rather, he challenges the sufficiency of the evidence supporting the court's express detriment finding at the 18-month review hearing on May 20, 2019. He further complains that the court did not make *express* detriment findings at the June 6, 2020 permanency planning hearing or at the December 15, 2020 section 366.26 hearing.

We begin with the court's express detriment finding at the 18-month review hearing. Father claims that " 'the real problem' " with this particular detriment finding is that it was based on his poverty, which is " 'barred by statute and our case law.' " (*In re S.S.*, *supra*, 55 Cal.5th at p. 373.) Unquestionably, " 'poverty alone, even abject poverty resulting in homelessness' " or resulting in "less than ideal housing arrangements," is an insufficient ground for terminating parental rights. (*In re P.C.* (2008) 165 Cal.App.4th 98, 99, 103-104 (*P.C.*); *In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1212-1213 (*G.S.R.*).) "[I]ndigency, by itself, does not make one an unfit parent, and 'judges [and] social workers . . . have an obligation to guard against the influence of class and life style biases.' " (*G.S.R.*, at p. 1212.)

31

Father relies on *P.C.* and *G.S.R.*  *G.S.R.* involved a "nonoffending, noncustodial" father who was not adjudicated an unfit parent based on clear and convincing evidence. (*G.S.R.*, *supra*, 159 Cal.App.4th at pp. 1205-1207, 1211.)  The father's two boys were adjudicated dependents based solely on allegations against the mother who had been arrested for having sex with a minor.  (*Id*. at pp. 1205-1207.)  The father had always been a part of his boys' lives but was unable to assume their custody because he did not have suitable housing for the boys; he rented a room in a house that could not accommodate children.  (*Id*. at p. 1206.)  Although the father admitted a history of domestic violence and substance abuse, those issues were resolved before the first dependency petition for the boys was filed.  (*Id*. at p. 1211.)  The father sought to obtain suitable housing for, and custody of, the boys throughout the proceedings.  (*Id*. at pp. 1207-1210, 1212-1213.)

The *G.S.R.* court held that the juvenile court violated the father's due process rights by terminating his parental rights without finding, based on clear and convince evidence, that he was an unfit parent.  (*G.S.R.*, *supra*, 159 Cal.App.4th at pp. 1211-1213, 1215.)  The juvenile court's previous detriment findings were unsupported by sufficient evidence because they were based on the father's poverty.  (*Id*. at p. 1213.)  The first detriment finding, at the time of the dispositional removal order, was made when the father was not yet in a position to take the boys into his custody, and two subsequent detriment findings were expressly based on the father's lack of suitable housing.  (*Ibid*.)

The *G.S.R.* court explained:  "As for the lack of housing, DCFS may not bootstrap the fact that the father was too poor to afford housing, which would not have served as a legitimate ground for removing the boys in the first place, to support findings of

detriment, all of which flow directly from the circumstances of the father's poverty and his concomitant willingness to leave his sons in his family's care while he stayed close, maintained familial ties and worked to raise rent money. This is particularly so when DCFS might have assisted the father to obtain affordable housing, but made no effort to do so." (*G.S.R.*, *supra*, 159 Cal.App.4th at p. 1213.) The court emphasized the record was "devoid of evidence" that the father was incapable of adequately parenting his sons, but for his inability to obtain housing. (*Id.* at p. 1214.)

*P.C.* extended the principles articulated in *G.S.R.* to an offending parent, who, like Father, had jurisdictional allegations sustained against her, completed her case plan, and resolved the issues that led to her children's dependency before the section 366.26 hearing. (*P.C.*, *supra*, 165 Cal.App.4th at pp. 101, 105; see, e.g., In re A.A. (2012) 203 Cal.App.4th 597, 606 [A "nonoffending" parent is one who has not been the subject of a jurisdictional finding under § 300.].) At the time of the 18-month review hearing in *P.C.*, the mother had completed her case plan, and her lack of suitable housing was the only impediment to returning her children to her care. (*P.C.*, at pp. 101-102) And, at the section 366.26 hearing, the mother's inability to obtain housing was the only basis for the agency's adoption recommendation for the children. (*Id.* at p. 102.)

*P.C.* first held that insufficient evidence supported the juvenile court's finding that reasonable services had been provided or offered to the mother. The social worker did not timely obtain mother's signature on a referral that might have moved her higher on an eligibility list for low-income housing. (*P.C.*, *supra*, 165 Cal.App.4th at pp. 105-106.) Additionally, the juvenile court's detriment findings, made at the 18-month review

hearing after the mother had completed her case plan and resolved the problems that led to her children's dependency, were likewise insufficiently supported because they were based solely on the mother's inability to find suitable housing. (*Id*. at p. 106.) Thus, P.C. held that the mother's due process rights were violated because her parental rights were terminated without a parental unfitness or child detriment finding, based on clear and convincing evidence. (See *Id*. at pp. 106-107.)

Relying on *G.S.R.* and *P.C.*, Father claims that insufficient evidence supports the court's detriment finding at the May 20, 2019 18-month review hearing. Indeed, Father had completed his case plan by May 20, 2019, and at the May 20 hearing, the parties agreed that the only impediment to returning the girls to Father *at that time* was his lack of suitable housing for the girls. Thus, we agree that insufficient evidence supports the May 20 detriment finding, given that it was based solely on Father's lack of suitable housing for the girls at that time.

Father correctly points out that the court did not make express detriment findings at the July 6, 2020 permanency review hearing or at the December 15, 2020 section 366.26 hearing. We disagree, however, with Father's argument that the lack of evidence supporting the May 20, 2019 detriment finding as to Father, coupled with the court's failure to make express detriment findings regarding Father at the subsequent permanency review hearing or at the section 366.26 hearing, makes this case indistinguishable from *P.C.*

"[A] finding of parental unfitness [or child detriment] is not necessarily required at the point when parental rights are terminated. In a dependency proceeding, due process

34

is satisfied if [parental] unfitness [or child detriment] is established at an earlier stage, and parental rights terminated later based on the child's best interest." (*Guardianship of Ann. S.* (2009) 45 Cal.4th 1110, 1134, citing *Cynthia D. v. Superior Court*, *supra*, 5 Cal.4th at p. 256 and *Santosky*, *supra*, 455 U.S. at p. 760; see *In re D.H.* (2017) 14 Cal.App.5th 719, 730-731.) This is precisely what occurred here. Additionally, the court made an implied finding of detriment at the section 366.26 hearing, and substantial evidence supports this finding.

The juvenile court first made detriment findings, regarding both parents, based on clear and convincing evidence at the December 2017 dispositional hearing. The court then made further detriment findings at the six- and 12-month review hearings in June and October 2018, respectively. As discussed, Father had completed his case plan by May 2019, and, in June 2020, Father obtained suitable, CFS-approved housing for the girls.

But at the section 366.26 hearing on December 15, 2020, the court rejected the parents' claims that the parental-benefit exception applied, finding that the girls would benefit more from adoption than they would from continuing their relationships with either parent. Thus, the court effectively found that terminating parental rights was in the girls' best interest. The court also expressly stated that it was not terminating parental rights based on Father's poverty, or his previous inability to obtain suitable housing for the girls, but based on his subsequent failure to protect the girls during his unsupervised visits. This later finding was an implied finding of detriment, and substantial evidence supports this finding.

Father's visits were ordered supervised at the permanency planning hearing on July 6, 2020, after CFS reported that Father was allowing his girlfriend, Mother, and "random people" to attend his unsupervised visits. A.V. reported that, during an unsupervised visit for A.M.'s birthday party in October 2019, Father's girlfriend and Mother argued, yelled, and cursed at each other. During his subsequent video-call visits during the COVID-19 pandemic, Father continued to allow either his girlfriend or Mother to be present, and he sometimes allowed "random people" to be present. At the time Father permitted Mother and his girlfriend to attend his unsupervised visits, both Mother and the girlfriend had pending dependency cases against them, and Mother was specifically subject to supervised visits only, due to the limitations the court had put on her visitation as a result of ongoing issues Mother needed to resolve. At the December 15, 2020 section 366.26 hearing, the deputy county counsel noted that Father had "not approached the court with any corrective type of information warranting a return to unsupervised visits, or anything beyond that."

Father's inability or unwillingness to protect the girls from verbal confrontations between his girlfriend and Mother, and his willingness to permit Mother to participate in his unsupervised visits, even though Mother was only permitted supervised visits and had ongoing issues she needed to resolve, distinguishes this case from *P.C.* In *P.C.*, the *only* impediment to returning the children to the mother's care was the mother's inability to obtain suitable housing. (*P.C.*, *supra*, 165 Cal.App.4th at pp. 105-106.) The mother had completed her case plan, and unlike Father here, did not subsequently demonstrate an inability or unwillingness to protect the children. (See *Ibid*.) To be sure, Father

36

completed his case plan before May 2019 and obtained suitable housing in June 2020. But he failed to protect the girls during unsupervised visits between October 2019 and July 2020.

Father claims it is improper for an appellate court to imply a juvenile court finding of detriment. But the case Father cites for this proposition, *In re Z.K.* (2011) 201 Cal.App.4th 51, does not support it. There, the court found there was insufficient evidence to support an implied finding of detriment, not that a finding of detriment could not be implied. (*Id*. at pp. 66-67.) "To support the termination of mother's parental rights, the department must point to specific *evidence* from which we can reasonably imply a finding by the juvenile court that it would be detrimental to place the minor with mother. [¶] The department fails to point to any such evidence." (*Id*. at p. 67.)

Alternatively, Father argues that evidence that he allowed his girlfriend T. and Mother to argue and swear at each other in front of the girls is insufficient to support an implied finding of detriment. He points out that there was no court order preventing him from allowing Mother to see the girls, nor was there any order preventing him from serving as Mother's visitation supervisor. Nor, he argues, was there any evidence that he left the girls in Mother's care, unsupervised. Thus, he claims insufficient evidence shows he subjected the girls to an unreasonable risk of harm during his unsupervised visits. We disagree.

The evidence that Father allowed his girlfriend T. and Mother to argue in front of the girls at A.M.'s October 2019 birthday party, and subsequently allowed either T. or Mother to attend his unsupervised visits with the girls, supports the court's implied

37

finding that it would have been detrimental to the girls to return them to Father's care at the time of the section 366.26 hearing. As CFS argues, "Father should not need a court order to recognize that Mother's ongoing substance abuse and her willingness to engage in domestic violence in the presence of the [girls]" posed an unreasonable risk of harm to them. Indeed, the record shows that T. had an open CFS case, and that her children had been removed from her care.

Additional evidence further supports the court's implied detriment finding at the section 366.26 hearing. During his unsupervised visits, Father was driving the girls around without a valid driver's license or appropriate car seats. Father was inconsistent with his video-call visits; he would not call the girls on time; and he would sometimes not call the girls at all. Father allowed "random people" to be present during his video-call visits, which was upsetting to A.V. A.V. was also upset with Father because she saw T. and her children in the background of a video-call, after Father falsely told her that he and T. were no longer together. Father also falsely told CFS that he and T. were no longer together. Father falsely denied CFS's concerns when confronted about them, but Father later admitted that what A.V. and CFS reported happened had actually happened.

In sum, the juvenile court did not violate Father's due process rights because it did not terminate parental rights without finding, based on clear and convincing evidence, that placing the girls with Father would be detrimental to them. To the contrary, the court made this detriment finding at the dispositional hearing in December 2017. Thereafter, Father completed his case plan and resolved his substance abuse problem—the issue that, for his part, led to the girls' dependency. But Father later demonstrated that he had not

benefited from his services in that he lacked good judgment and the ability or willingness to protect the girls from emotional and physical harm.

Thus, notwithstanding the insufficiency of the evidence supporting the court's express detriment finding at the May 20, 2019 18-month review hearing, and the court's failure to make express detriment findings at the July 6, 2020 permanency review hearing and at the December 15, 2020 section 366.26 hearing, the entire record shows, and the court reasonably and implicitly found, that returning the girls to Father at the time of the section 366.26 hearing would have been detrimental to the girls. On that basis, the court terminated Father's parental rights. The court did not terminate Father's parental rights based on his poverty or his lack of suitable housing for the girls—an issue that was resolved in early 2020, before the July 6, 2020 permanency review hearing and the December 15, 2020 section 366.26 hearing.

## IV.  DISPOSITION

The December 15, 2020 orders terminating parental rights and selecting adoption as the permanent plan for A.V. and A.M. are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
                                                                J.

We concur:


MILLER _____
        Acting P. J.


SLOUGH _____
                    J.